PATRICK J. ASCIONE (USB #6469)
CAMILLE J. JARVIS (USB #13755)
ASCIONE & ASSOCIATES, LLC
4692 North 300 West, Suite 220
Provo, Utah 84604
Telephone: (801) 854-1200
Fax: (801) 854-1201
Email: patrick@ana-law.com
       cjarvis@ana-law.com

*Attorneys for Plaintiffs*

---

## IN THE THIRD JUDICIAL DISTRICT COURT, IN AND FOR
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| SARAH ARNSON an individual; CASEY BILBRO and CAROL BILBRO, a married couple; DAVID PRESZLER and MARY PRESZLER, a married couple; MATT RIPPERTON and SHUFEN RIPPERTON, a married couple; STEPHEN HADLOCK; an individual; ALTHEA EMERY a/k/a ALTHEA HADLOCK, an individual; TIM BRENT and MARIANNE DECRANE-BRENT, a married couple; and JOHN BRENT, an individual; | **SUMMONS**<br><br>Case No. 120904880<br><br>Judge: Robert Faust |
| Plaintiffs, | |
| vs. | |
| d/b/a MY INVESTING PLACE L.L.C., an expired Utah Limited Liability Company; ELIZABETH McCLEERY, an individual; TOP FLIGHT LENDING, an expired Colorado Trade Name; BRENT CLARKSON, an individual; WESTERN SITE SERVICES L.L.C., a revoked Nevada Limited Liability Company; TRI GLOBAL TRADING COMPANY, L.L.C., a revoked Nevada Limited Liability Company; TRI GLOBAL | |

DEVELOPMENT, L.L.C., a Nevada Limited
Liability Company, DON SNIDER, an
individual; DAVID DRAKE, an individual;
NORTH SHORE INVESTMENTS, L.L.C., a
revoked Nevada Limited Liability Company;
GERARD C. LANSER, an individual; JAMES
SHIRATO, an individual; INDIAN RIDGE
REAL ESTATE GROUP, INC, a Missouri
Corporation; INDIAN RIDGE REALTORS,
INC., an administratively dissolved Missouri
corporation; INDIAN RIDGE RESORT
COMMUNITY (CHARTER NO. X00729008),
a fictitious and inactive Missouri business
entity; INDIAN RIDGE RESORT
COMMUNITY (CHARTER NO. X00758129),
a fictitious and expired Missouri business
entity; INDIAN RIDGE RESORT, INC. a/k/a
THE RESORT HOTEL AT SILVER DOLLAR
CITY, INC. a/k/a THE RESORT HOTEL ON
TABLE ROCK LAKE, INC., an
administratively dissolved Missouri
corporation; INDIAN RIDGE RESORT II,
INC. an administratively dissolved Missouri
corporation; INDIAN RIDGE RESORT III,
INC., an administratively dissolved Missouri
Corporation; INDIAN RIDGE RESORT IV,
INC., an administratively dissolved Missouri
Corporation; INDIAN RIDGE RESORT V,
INC., an administratively dissolved Missouri
corporation; THE LAWRENCE BANK, a
Kansas corporation; GREAT LAKES TITLE &
ESCROW COMPANY, a Maryland
Corporation; DAVID CLARK, an individual;
ERIN JEWETT, an individual; KIP HURLEY,
an individual; MARY HURLEY, an individual;
and JOHN DOES 1- 10.

Defendants.

**THE STATE OF UTAH TO THE ABOVE-NAMED DEFENDANT:**
**DAVID CLARK**

A lawsuit has been filed against you.

You are hereby summoned and required to file an answer in writing to the attached

COMPLAINT with the Clerk of the Court at the Third Judicial District Court in and for Salt

Lake County, State of Utah at the following address: <u>450 South State Street, Salt Lake City, UT</u>

<u>84114</u>, and to serve upon, or mail to, Plaintiffs' Attorney, Patrick J. Ascione, at 4692 North 300

West, Suite 220, Provo, Utah  84604, a copy of said answer, within thirty (30) days after service

of this summons upon you.

If you fail to do so, judgment by default will be taken against you for the relief

demanded in said COMPLAINT, which has been filed with the Clerk of said Court and a copy of

which is attached and served upon you.

DATED this _____ day of August, 2012.

ASCIONE & ASSOCIATES, LLC

PATRICK ASCIONE,
Attorney for Plaintiffs

**Serve Defendant at:**
David Clark
3500 Clinton Parkway
Lawrence, Kansas  66044

PATRICK J. ASCIONE (USB #6469)
CAMILLE J. JARVIS (USB #13755)
ASCIONE & ASSOCIATES, LLC
4692 North 300 West, Suite 220
Provo, Utah 84604
Telephone: (801) 854-1200
Fax: (801) 854-1201
Email: patrick@ana-law.com
       cjarvis@ana-law.com
*Attorneys for Plaintiffs*

---

## IN THE THIRD JUDICIAL DISTRICT COURT, IN AND FOR
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| SARAH ARNSON an individual; CASEY BILBRO and CAROL BILBRO, a married couple; DAVID PRESZLER and MARY PRESZLER, a married couple; MATT RIPPERTON and SHUFEN RIPPERTON, a married couple; STEPHEN HADLOCK; an individual; ALTHEA EMERY a/k/a ALTHEA HADLOCK, an individual; TIM BRENT and MARIANNE DECRANE-BRENT, a married couple; and JOHN BRENT, an individual; | **COMPLAINT**<br><br>**JURY DEMAND**<br><br><br>Case No. 120904885<br><br>Judge: Robert Faust |
| Plaintiffs, | |
| vs. | |
| d/b/a MY INVESTING PLACE L.L.C., an expired Utah Limited Liability Company; ELIZABETH McCLEERY, an individual; TOP FLIGHT LENDING, an expired Colorado Trade Name; BRENT CLARKSON, an individual; WESTERN SITE SERVICES L.L.C., a revoked Nevada Limited Liability Company; TRI GLOBAL TRADING COMPANY, L.L.C., a revoked Nevada Limited Liability Company; TRI GLOBAL DEVELOPMENT, L.L.C., a Nevada Limited | |

Liability Company, DON SNIDER, an
individual; DAVID DRAKE, an individual;
NORTH SHORE INVESTMENTS, L.L.C., a
revoked Nevada Limited Liability Company;
GERARD C. LANSER, an individual; JAMES
SHIRATO, an individual; INDIAN RIDGE
REAL ESTATE GROUP, INC, a Missouri
Corporation; INDIAN RIDGE REALTORS,
INC., an administratively dissolved Missouri
corporation; INDIAN RIDGE RESORT
COMMUNITY (CHARTER NO. X00729008),
a fictitious and inactive Missouri business
entity; INDIAN RIDGE RESORT
COMMUNITY (CHARTER NO. X00758129),
a fictitious and expired Missouri business
entity; INDIAN RIDGE RESORT, INC. a/k/a
THE RESORT HOTEL AT SILVER DOLLAR
CITY, INC. a/k/a THE RESORT HOTEL ON
TABLE ROCK LAKE, INC., an
administratively dissolved Missouri
corporation; INDIAN RIDGE RESORT II,
INC. an administratively dissolved Missouri
corporation; INDIAN RIDGE RESORT III,
INC., an administratively dissolved Missouri
Corporation; INDIAN RIDGE RESORT IV,
INC., an administratively dissolved Missouri
Corporation; INDIAN RIDGE RESORT V,
INC., an administratively dissolved Missouri
corporation; THE LAWRENCE BANK, a
Kansas corporation; GREAT LAKES TITLE &
ESCROW COMPANY, a Maryland
Corporation; DAVID CLARK, an individual;
ERIN JEWETT, an individual; KIP HURLEY,
an individual; MARY HURLEY, an individual;
and JOHN DOES 1- 10.

     Defendants.

//

COME NOW the Plaintiffs, by and through counsel undersigned, of the law firm Ascione & Associates, L.L.C., and complain of the Defendants and allege as follows:

## INTRODUCTION

This complaint arises from the Plaintiffs' investment in a failed development located in Branson West, Missouri, known as the Indian Ridge Resort Community ("IRRC"). The Defendants identified herein promoted, offered, and sold an investment contract in the IRRC to each of the Plaintiffs. In reality, the IRRC was a massive scheme to defraud Plaintiffs of hundreds of thousands of dollars. The scheme involved several parties, including a real estate developer, construction contractor, an investment firm, several banks, and at least one mortgage broker.

The scheme involved a series of misrepresentations, wherein the participants inflated the value of undeveloped, unimproved real property that constituted the IRRC. Based on promises of a quick profit, the real estate developer, construction contractor, and investment firm induced Plaintiffs to participate in the development of the IRRC by taking out construction loans to finance construction of duplexes within the IRRC.

The mortgage broker furthered the scheme by altering Plaintiffs' financial information as necessary to get Plaintiffs approved for construction loans. The banks knowingly accepted the altered loan applications and approved loans in amounts far exceeding the actual value of the lots Plaintiffs were to finance. They did this based on appraisals reflecting the value of the lots as though they were improved with roads and utilities, knowing that the lots actually were completely unimproved.

The banks then pressured Plaintiffs, each living out of state and therefore basing their decision to borrow on these misrepresentations, to execute loan documents misrepresenting the value and improved status of the lots, leaving Plaintiffs little time to review these documents adequately. The parties then concealed the scheme by misrepresenting the progress of construction in monthly newsletters and other communications sent to Plaintiffs. By the time Plaintiffs discovered what really was happening, hundreds of thousands of dollars had been siphoned from their loans. Now that the Plaintiffs are facing financial ruin as a result of this scheme, at least one participating bank is attempting to collect on these loans, which were obtained by fraud.

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Sarah Arnson is a resident of, and domiciled in, Utah County, Utah. Sarah Arnson may be referred to throughout this Complaint as the collective "Arnsons" because she entered into these transactions while married to Greg Arnson. Greg Arnson and Sarah Arnson have since divorced. Greg Arnson is not a party in this matter because he has filed for bankruptcy due to the actions of the Defendants.

2. Plaintiffs Casey Bilbro and Carol Bilbro ("Bilbros") are residents of, and domiciled in, Utah County, Utah. The Bilbros may be referred to individually or collectively throughout this Complaint.

3. Plaintiffs David Preszler and Mary Preszler ("Preszlers") are residents of, and domiciled in, Davis County, Utah. The Preszlers may be referred to individually or collectively throughout this Complaint.

4.  Plaintiffs Matt Ripperton and Shufen Ripperton ("Rippertons") are residents of, and domiciled in, Utah County, Utah.  The Rippertons may be referred to individually or collectively throughout this Complaint.

5.  The Plaintiffs Stephen Hadlock and Althea Emery a/k/a Althea Hadlock ("Hadlocks") are residents of, and domiciled in, Davis and Salt Lake County, Utah respectively.  The Hadlocks may be referred to individually or collectively throughout this Complaint.

6.  The Plaintiffs Tim Brent and Marianne Decrane Brent ("Brents") are residents of, and domiciled in, Contra Costa County, California.  The Brents may be referred to individually or collectively throughout this Complaint.

7.  Plaintiff John Brent is a resident of, and domiciled in, Morrow County, Ohio.

8.  Defendant My Investing Place L.L.C. ("MIP") is an expired Utah limited liability company which was located at 63 E. 11400 S. Suite 196, Sandy, UT 84070, with its registered agent previously located at 856 S. Sage Drive, Suite 2, Cedar City, UT 84720.

9.  Defendant Elizabeth McCleery ("McCleery") is an individual and on information and belief is a resident of, and domiciled in, the State of Utah.

10. Defendant Top Flight Lending is an expired Trade Name assigned by the State of Colorado, the true registrant being Brent Clarkson. 100 51st Ave, Greeley, CO. 80634.

11. Defendant Brent Clarkson ("Clarkson") is an individual and on information and belief is a resident of, and domiciled in, the State of Arizona.

12. Defendant Western Site Services L.L.C. ("WSS") is a revoked Nevada limited liability company with its registered agent, Robert Alexander, listed at 1701 Rock Springs Drive #2148,

Las Vegas, NV 89128. Defendant WSS was succeeded by Tri Global Development, LLC, and Tri Global Trading Company, LLC. As a result, the Plaintiffs will refer to both parties in this Complaint as "WSS" or "WSS/Tri Global."

13. Defendant Tri Global Development L.L.C. ("Tri Global" or "WSS/Tri Global") is a Nevada limited liability company with its registered agent, Robert Alexander, listed at 1701 Rock Springs Drive #2148, Las Vegas, NV 89128. Tri Global Development is also registered with the State of Colorado as a foreign limited liability company and lists its principal street address as 1160 S. Lipan, Denver, CO 80223. Tri Global is the successor of the Defendant Western Site Services, LLC.

14. Defendant Tri Global Trading Company L.L.C. ("Tri Global" or "WSS/Tri Global") is a revoked Nevada limited liability company with its registered agent, Robert Alexander, listed at 1701 Rock Springs Drive #2148, Las Vegas, NV 89128. Tri Global Trading Company is also registered but delinquent with the State of Colorado with its principal street address as 1160 S. Lipan, Denver, CO 80223.  Its registered agent, Charles Liken, is listed at 17200 Waterhouse Cir., Parker, CO 80134. On information and belief, Tri Global Trading Company and Tri Global Development are the same entity and alter egos of one another.  As a result, The Plaintiffs will refer to both parties in this Complaint as "Tri Global" or "WSS/Tri Global."

15. Defendant Don Snider ("Snider") is an individual and on information and belief is a resident of, and domiciled in, the State of Colorado.

16. Defendant David Drake ("Drake") is an individual and on information and belief is a resident of, and domiciled in, the State of Colorado.

17. Defendant North Shore Investments L.L.C. ("North Shore") is a revoked Nevada limited liability company with its registered agent, Robert Alexander, listed at 1701 Rock Springs Drive #2148, Las Vegas, NV 89128.

18. Defendant Gerard C. Lanser ("Lanser") is an individual and on information and belief is domiciled at 320 West Pacifico Circle, Litchfield Park, AZ 85340.

19. Defendant James Shirato ("Shirato") is a resident of and domiciled in Missouri located at 305 East Walnut, Suite 111-LL, Springfield, Missouri 65806.

20. Defendant Indian Ridge Real Estate Group, Inc. is a Missouri corporation whose registered agent is James E. Shirato at 305 E. Walnut, Ste 111-LL, Springfield, Missouri 65806.

21. Defendant Indian Ridge Realtors, Inc. is an administratively dissolved Missouri corporation whose registered agent, Gianina Shirato-Catron, is at 3023 South Fort, Unit D, Springfield, Missouri 65807.

22. Defendant Indian Ridge Resort Community (Charter No. X00729008) is a "fictitious" and inactive business registered with the Missouri Secretary of State by James E. Shirato at 305 E. Walnut, Ste 111-LL, Springfield, Missouri 65806.

23. Defendant Indian Ridge Resort Community (Charter No. X00758129) is a "fictitious" and expired business registered with the Missouri Secretary of State by Indian Ridge Resort, Inc. and James E. Shirato at 305 E. Walnut, Ste 111-LL, Springfield, Missouri 65806.

24. Defendant Indian Ridge Resort, Inc. a/k/a The Resort Hotel at Silver Dollar City, Inc. a/k/a The Resort Hotel on Table Rock Lake, Inc. is an administratively dissolved Missouri corporation whose registered agent is James E. Shirato at 305 E. Walnut, Ste 111-LL,

Springfield, Missouri 65806.

25. Defendant Indian Ridge Resort II, Inc. is an administratively dissolved Missouri corporation whose registered agent is James E. Shirato at 305 E. Walnut, Ste 111-LL, Springfield, Missouri 65806.

26. Defendant Indian Ridge Resort III, Inc. is an administratively dissolved Missouri corporation whose registered agent is James E. Shirato at 305 E. Walnut, Ste 111-LL, Springfield, Missouri 65806.

27. Defendant Indian Ridge Resort IV, Inc. is an administratively dissolved Missouri corporation whose registered agent is James E. Shirato at 305 E. Walnut, Ste 111-LL, Springfield, Missouri 65806.

28. Defendant Indian Ridge Resort V, Inc. is an administratively dissolved Missouri corporation whose registered agent is James E. Shirato at 305 E. Walnut, Ste 111-LL, Springfield, Missouri 65806.

29. The Defendants Indian Ridge Real Estate Group, Inc., Indian Ridge Realtors, Inc., Indian Ridge Resort Community (Charter No. X00729008), Indian Ridge Resort Community (Charter No. X00758129), Indian Ridge Resort, Inc. a/k/a The Resort Hotel at Silver Dollar City, Inc. a/k/a The Resort Hotel on Table Rock Lake, Inc., Indian Ridge Resort II, Inc., Indian Ridge Resort III, Inc., Indian Resort IV, Inc., and Indian Ridge Resort V, Inc. are one and the same, are alter egos of one another and owned by James E. Shirato. Hereafter, these entities will be referred to by the Plaintiffs collectively as the "Shirato Indian Ridge Business Entities."

30. Defendant The Lawrence Bank ("Lawrence Bank") is a Kansas corporation whose

principal place of business is 3500 Clinton Parkway, Lawrence, Kansas 66044 with its registered

agent, Les J. Dreiling, being located at 3500 Clinton Parkway, Lawrence, Kansas 66044.

31. Defendant Great Lakes Title and Escrow Company ("Great Lakes") is a Maryland

corporation whose principal place of business is listed as 208 E. Ridgeville Blvd., Suite 203, Mt.

Airy, Maryland. 21771, with its registered agent, The Corporation Trust Incorporated, located at

351 West Camden Street, Baltimore, Maryland 21201.

32. Defendant David Clark ("Clark") is an individual and on information and belief is

domiciled in the state of Kansas.

33. Defendant Erin Jewett ("Jewett") is an individual and on information and belief is

domiciled in the state of Colorado.

34. Defendant Kip Hurley is an individual and on information and belief is domiciled in the

state of Maryland.

35. Defendant Mary Hurley is an individual and on information and belief is domiciled in the

state of Maryland. Kip and Mary Hurley may be referred to collectively as the "Hurleys."

36. The Defendants John Does 1-5 are individuals or business entities with ownership

interests in My Investing Place.

37. The Defendants John Does 6-10 are individuals or business entities that have yet to be

identified but are suspected of being directly involved with the substance of this Complaint and

are the agents, representatives and principals of the other Defendants identified herein.

38. At all times relevant to the facts alleged herein, My Investing Place ("MIP") and

Elizabeth McCleery were acting as agents for Defendants David Drake, Don Snider, and

WSS/Tri Global.

39. Wells Fargo, Columbian Bank (which was taken over by the FDIC in 2008), and Wachovia (which was purchased by Wells Fargo), are referenced throughout this Complaint and played a significant role in the IRRC. However, these institutions are not parties in this action due to mandatory arbitration clauses in relevant documents with the Plaintiffs.

40. This Court has subject matter jurisdiction pursuant to Utah Code Ann. § 78A-5-102.

41. This Court has personal jurisdiction over out-of-state Defendants pursuant to Utah Code Ann. § 78B-3-205.

42. Venue is proper in this Court pursuant to Utah Code Ann. §§ 78B-3-304, 306, and 307.

43. Plaintiffs' claims were dismissed for lack of subject matter jurisdiction by the United States District Court, District of Utah on June 7, 2012. Pursuant to Utah Code Ann. § 78B-2-111(1), Plaintiffs' claims are timely.

## THE GENERAL SCHEME

44. This Complaint arises from the Plaintiffs' investment in a failed development located in Branson West, Missouri, known as the Indian Ridge Resort. The Defendants identified herein promoted, offered, and sold an investment contract in the Indian Ridge Resort to each of the Plaintiffs.

45. The IRRC was represented to the Plaintiffs as a luxury vacation resort consisting of 900 duplex vacation homes situated on 1,000 acres and 1,800 individual luxury residential units. The section of the IRRC, on which Plaintiffs' investment properties were to be located, is known as "Tract 34," which was originally part of Phase I of the IRRC. It was also represented that the

IRRC would contain the third largest indoor water park in the United States, tournament golf courses, trails, shopping, fine dining, and other destination attractions located in Branson West, Missouri. The groundbreaking of the IRRC included prominent business and political figures, including then governor of Missouri, Matt Blunt.

46. This development involved a financing scheme where individuals invested in residential units as "credit partners" through construction loans.

47. Investors were given two investment options: (1) participate in a profit-sharing arrangement based on rental receipts from Tract 34, or (2) have the properties sold upon completion to pay off the construction loan.

48. The majority of investors, including the Plaintiffs, chose to have the properties sold upon completion.

49. The key players promoting the investment interests to the Plaintiffs and other third-parties, either directly or indirectly, included Shirato, the Shirato Indian Ridge Business Entities, WSS/Tri Global, North Shore, MIP, Clarkson, McCleery, Drake, Snider, and John Does 1-10.

50. Drake and Snider owned and operated Western Site Services, Tri Global Trading, Tri Global Development, and North Shore. North Shore held title to the property located in Tract 34 before it was transferred to Plaintiffs for construction.

51. Defendant Gerard Lanser, as a principal for North Shore, had knowledge of the scheme and was aware of the dealings regarding Tract 34.

52. Defendant Erin Jewett was employed by WSS/Tri Global and on several occasions communicated with Plaintiffs as well as other Defendants involved in the scheme.

53. Western Site Services and its successor, Tri Global Development, were the construction companies with which Plaintiffs entered contracts for the construction of the duplexes.

54. Tri Global Trading acted as an investment company for Drake and Snider, through which they invested in various ventures, including oil speculation and investment schemes in China.

55. Investor solicitation in the IRRC began with Shirato, the Shirato Indian Ridge Business Entities, Drake, Snider, North Shore, and WSS/Tri Global.

56. Shirato and the Shirato Indian Ridge Business Entities assembled the marketing materials distributed to the community and prospective investors. Shirato and the Shirato Indian Ridge Business Entities took the lead with the local municipal governments for the necessary approval in moving the project forward.

57. As put by Shirato and the Shirato Indian Ridge Business Entities in investment promotional materials given to the Plaintiffs, the Indian Ridge Resort Community is "A SHIRATO DEVELOPMENT." To further illustrate this point, Shirato and the Shirato Indian Ridge Business Entities bonded the IRRC, including Tract 34, relating to the Plaintiffs' investment.

58. Promotion of the investment to potential investors began as early as 2006.

59. MIP held pitch meetings on a monthly basis for the IRRC investment opportunity to gather investors for the project. McCleery usually provided additional information regarding the investment. Clarkson attended some of the pitch meetings.

60. Drake and Snider of WSS/Tri Global and North Shore attended some pitch meetings held by MIP.

61. The Plaintiffs, along with other potential investors, were invited to attend these pitch meetings at MIP located in Sandy, Utah. The Brents and John Brent learned about the opportunity through a conference call with McCleery. Neither of them attended any pitch meetings, although they had many conversations with both McCleery and Clarkson before deciding to invest.

62. At the pitch meetings, the Defendants generally discussed the IRRC, Shirato, and the Shirato Indian Ridge Business Entities in such a degree that Drake, Snider, WSS/Tri Global, North Shore, MIP, McCleery, and Clarkson appeared to represent and be intricately associated with the IRRC, Shirato, and the Shirato Indian Ridge Business Entities. This perception was confirmed by the dissemination of marketing materials prepared by Shirato and the Shirato Indian Ridge Business Entities to the Plaintiffs. In essence, the IRRC, Shirato, and Shirato Indian Ridge Business Entities were the topic at the pitch meetings.

63. It was represented to the Plaintiffs and other potential investors how Shirato, the Shirato Indian Ridge Business Entities, Drake, Snider, WSS/Tri Global, North Shore, and other Defendants would provide the necessary experience to ensure the construction project was completed in an expedited manner.

64. Shirato and the Shirato Indian Ridge Business Entities represented directly and indirectly to the Plaintiffs that the lots the Plaintiffs were investing in were improved lots with utility lines when in fact they were not improved and had no utility lines.

65. These representations by Shirato and the Shirato Indian Ridge Business Entities were intended to and, in fact, did induce the Plaintiffs, along with other investors, to invest in the

IRRC. On information and belief, large portions of the Plaintiffs' construction loan proceeds representing their investments went directly or indirectly to the benefit of Shirato and the Shirato Indian Ridge Business Entities. The success of the Indian Ridge Resort, consisting of the Plaintiffs' investments, was and is inextricably tied to Shirato and the Shirato Indian Ridge Business Entities' development of the broader IRRC.

66. To secure investor participation, the Defendants told the Plaintiffs, along with other prospective investors, that the IRRC was attracting several large investors and if they wanted to be involved, they would need to pay a reservation fee of $3,000.00 per unit that would be fully refundable if they secured the necessary financing through *established* lending partners ("Lending Partners").

67. At all times Lawrence Bank was characterized as a "Lending Partner" by Drake, Snider, WSS/Tri Global, North Shore, MIP, McCleery, and Clarkson and played an integral role in the financing scheme for the IRRC. Lawrence Bank was fully aware of the investment scheme, the overall development, and the purpose for which the investors were seeking financing. Further, Drake and Snider did not pay the subcontractors and material providers. Eventually, the subcontractors and material providers abandoned the construction site and have in turn sued the Plaintiffs and/or filed liens as to the construction lots within the IRRC.

68. Defendants assured the Plaintiffs that they would secure, through Defendants' efforts, the necessary financing with the Lending Partners.

69. The Plaintiffs each provided WSS/Tri Global, North Shore, and MIP with the $3,000.00 reservation fee and investment agreement for each unit they intended to finance.

70. The Plaintiffs each executed a new construction agreement with WSS/Tri Global, which memorialized WSS/Tri Global's agreement to act as the builder of their investment unit(s).

71. The Plaintiffs executed real estate purchase agreements with North Shore for their lots. The Plaintiffs were initially told they would be able to pick which lots they wanted to build on, but ultimately the lots were assigned to the Plaintiffs by the Defendants.

72. On information and belief, Plaintiffs were assigned lots instead of choosing the lots because North Shore did not actually own all of the lots before the day of the closing for each lot.[1]

73. Indeed, on the day of closing, a double closing was held with all of the money for closing coming from construction loans. The first closing entailed the IRRC deeding the lot to North Shore with no money changing hands. Then, during the second closing, North Shore would deed the lot to the investor(s).

74. Then, the applicable Lending Partner would file a new deed of trust on the investor(s)'s lot to secure the construction loan.

75. The Plaintiffs worked with and through Clarkson of Top Flight Lending, McCleery, WSS/Tri Global, North Shore, MIP, Lawrence Bank, and other Lending Partners to become credit partners through financing the IRRC.

76. The construction loans for which the Plaintiffs were approved are not customary loans

---

[1] This information is additionally supported by a recently-decided district court case in Missouri involving the IRRC and some of the same defendants. *See* Jimmy Jones Excavation, Inc. v. Western Site Services, LLC, et al., Case Number: 09SN-CC00092, 8 (Stone County, Missouri). The Judgment can be accessed at https://www.courts.mo.gov/fv/c/fileviewer.do?l=SMPDB0003_CT39&di=95505. Information from this Judgment further supports Plaintiffs' arguments, specifically in Paragraphs 72 (pg. 8 of Judgment), 73 (pg. 8 of Judgment), and 131 (pgs. 11, 17-18 of Judgment), of this Complaint, and generally throughout this Complaint.

but were loans with terms created specifically for the IRRC. These loans and terms were only

available to individuals investing in the IRRC with Drake and Snider.

77. The Defendants represented to the Plaintiffs and other prospective investors that the lot(s)

selected for financing and development were improved with gas, electric, water, and sewer lines.

In fact, the lots sold to each of the Plaintiffs were not improved. In reality, no gas, electric, water

or sewer lines have ever been run to Tract 34 of the IRRC despite numerous public

representations by the Defendants. The "improved" conditions of the construction lots were a

material basis for the loan appraisals.

78. The financing the Plaintiffs sought, and were ultimately approved for as investors,

reflected the value of improved lots and a fully developed project as indicated by the following

language in the appraisals used by Lawrence Bank and other Lending Partners:

> [S]ubject to completion per plans and specification on the basis of a hypothetical
> condition that improvements have been completed.

79. Based on the hypothetical valuations and with the help of Shirato, the Shirato Indian

Ridge Business Entities, WSS/Tri Global, North Shore, Drake, Snider, Clarkson, and agents

acting on behalf of Lawrence Bank, including but not limited to Kip Hurley, Mary Hurley, and

Great Lakes, and the other Lending Partners, each of the Plaintiffs were approved for inflated

construction loans.

80. During the construction loan qualification process, WSS/Tri Global, Drake, Snider,

Clarkson, McCleery, and MIP provided updates to the Plaintiffs on the projects through

newsletters and emails. The newsletters and emails contained numerous representations which

led the Plaintiffs to believe development of the Indian Ridge Resort was moving forward, further encouraging and spurring the Plaintiffs on to solidify their investment stake as credit partners through construction loans.

81. In or about January 2008, Drake and Snider represented to McCleery, and MIP that the construction on the golf course was underway. During the summer of 2008, Drake and Snider further represented to Clarkson that the 18th hole was being finished and the golf course would be ready by the time the first thirty houses were finished. Drake and Snider made these representations knowing that the information would be passed on to the Plaintiffs and other potential investors.

82. The actual investment in the IRRC was set up as an investment scheme. Specifically, the nature of each investor's participation was that of a credit partner. As credit partners, the investors were required to finance the development by taking out construction loans to construct individual units. Upon completion of construction, the newly finished units were to be immediately resold, if not sold before construction was complete, and the proceeds applied to pay off the balances of the investors' construction loan(s). In return, the Plaintiffs and other prospective investors were promised $5,000.00 by the Defendants Drake, Snider, WSS/Tri Global, North Shore, MIP, McCleery, and Clarkson for each individual unit ($10,000.00 for each duplex) they financed. In the alternative to the $5,000.00 return for each individual unit financed, the Defendants offered the Plaintiffs and other potential investors the ability to purchase the financed unit(s) outright and then participate in profit sharing based on rental revenues from each unit owned.

83. Further still, the Defendants Drake, Snider, WSS/Tri Global, North Shore, MIP, and McCleery promised to make the interest portion of the Plaintiffs' loan payments until construction was completed, initial down payments on the loans, and closing costs. The Plaintiffs and other prospective investors were not expected to provide any funding other than the construction loan.

84. Investors were informed that they would not have any managerial control and simply needed to invest by becoming financing partners with the established lending partners.

85. The Defendants represented to the Plaintiffs and other prospective investors that their investment in the IRRC would yield quick returns and was virtually riskless. The Plaintiffs were led to believe that the only risk associated with the investment was the initial reservation fee which would not be refunded to the Plaintiffs, if and only if, they were unable to qualify for financing.

86. During the pitch meetings, the Defendants increased the appeal of investing in the IRRC by explaining that parts of the framing for the residential units were pre-fabricated, thereby ensuring that the entire development would be completed within four months from the date of groundbreaking.

87. The pre-fabricated units were being provided by Vickie Drake. On information and belief, WSS/Tri Global, Drake, and Snider never intended to use prefabricated units but used Vickie Drake as a means of transferring additional funds back to themselves.

88. Vickie Drake as the wife of Drake was fully aware of David Drake's and Don Snider's intentions and worked in concert with those intentions.

89. The Defendants further represented to the Plaintiffs and other prospective investors that they would build other commercial and residential structures in the broader IRRC, making the lots Plaintiffs were to finance even more marketable and valuable.

90. The Defendants represented to the Plaintiffs and other prospective investors that the Defendants would manage all aspects of construction, financing, and loan qualification, as well as marketing and resale of the financed units to secondary potential buyers. Those investors who did not want to resell, were told they could use a property management company to rent the unit(s) yielding an even greater return on their investment.

91. The Defendants represented to the Plaintiffs and other prospective investors that draws on the construction loans would only be made with the Plaintiffs' express consent and upon verifiable construction progress. The Plaintiffs were assured that each Lending Partner performed an independent inspection of the properties and would not permit funding to be disbursed if work had not been completed. Furthermore, the Defendants were to apply the proceeds from the loan draws to pay subcontractors and material providers. The Defendants knew that it would be practically impossible for the Plaintiffs and other prospective investors, as out-of-state residents, to monitor the progress of the construction of the Indian Ridge Resort.

92. In reality, the loan draws were not based on construction progress nor used to pay subcontractors and material providers. Instead, the construction draws were used to pay the credit partner fee of $5,000.00 per unit and to make mortgage and interest payments back to the lending partners, resembling a Ponzi scheme.

93. The IRRC was intended to be, and in fact was, significantly funded through investor

construction loans obtained by investors such as the Plaintiffs. Such loans were obtained through Lending Partners like Lawrence Bank. These Lending Partners were aware of the investment arrangement involving the Plaintiffs as credit partners. With this knowledge, Lawrence Bank worked with the other Defendants to ensure the construction loans were approved, in turn, ensuring the development was financed.

94. The IRRC was abandoned nearly two and a half years ago by the Defendants with only a handful of buildings started, none of which have been finished. After several years of exposure to the elements, the half-finished buildings are now a complete loss. The lumber is now warped and rotten. No roads have been graded or laid. Contrary to the innumerable representations, no utilities—water, sewer, gas, electric, phone, cable, or internet—have been run to the development. Soil erosion from the ground cleared and left unseeded is pervasive. Stone County, Missouri has refused to enforce the construction bonds on behalf of the Plaintiffs and other investors, all but guaranteeing the development a complete failure.

95. Additionally, all of the lots on Tract 34 have been foreclosed on through judicial proceedings to pay sub-contractors (see footnote 1 on page 15 of this Complaint), leaving the Plaintiffs with nothing to show for their investments or the balance remaining on their loans.

96. Having invested and lost millions, the personal and financial toll the Defendants' investment scheme has had on the Plaintiffs is immeasurable. Close relationships in particular have suffered. Any sense of security as to their respective personal and financial futures has been eviscerated.

97. The IRRC promoted and pitched by Shirato, the Shirato Indian Ridge Business entities,

WSS/Tri Global, North Shore, MIP, Drake, Snider, Clarkson, and McCleery as a five-star

destination resort, enabled by the complicit participation of Lending Partners like Lawrence

Bank, encouraged by local public officials, each with full knowledge as to the nature of the

overall investment scheme, is now a failure and blight of infamous scale.

### The Role of Great Lakes

98. Lawrence Bank closed all of its loans for the IRRC through Great Lakes.

99. Kip and Mary Hurley were the owners and sole officers of Great Lakes as it existed in

Missouri.

100. Great Lakes was created in Maryland on March 6, 2000 with Mary Hurley listed as its

registered agent.

101. The company registered in Missouri on October 14, 2005. On information and belief,

Great Lakes established a presence in Missouri for the sole purpose of assisting in the closing of

loans related to the IRRC.

102. Kip and Mary Hurley had knowledge of the IRRC scheme and materially aided the other

Defendants in defrauding Plaintiffs.

103. Indeed, Great Lakes set up a trailer overlooking Tract 34 and knew of the construction

progress, or lack thereof, of the overall project, including the complete lack of utilities and roads

supposedly running to Tract 34.

104. Great Lakes acted as Lawrence Bank's on-site agent throughout the process of securing

and closing construction loans on Tract 34.

105. Missouri revoked Great Lakes' registration on October 19, 2007 for failing to timely file

an annual report required by Missouri law.

106. On November 13, 2007, just seven days before Lawrence Bank closed its first loan with Plaintiffs, Great Lakes filed documents to have its registration reinstated.

107. On July 7, 2009, after closing numerous loans with Plaintiffs for the IRRC, Great Lakes' Missouri registration was again revoked when the company failed to file its annual report.

108. To date, Great Lakes has not attempted to reinstate its registration in Missouri.

### The Role of My Investing Place

109. Drake and Snider contacted McCleery of MIP and requested MIP's services in promoting the investment opportunity.

110. Drake and Snider explained that funding for the IRRC was to be achieved through a financing scheme using the credit of individual investors to obtain construction loans for individual units. Investors who used their credit to obtain financing were called credit partners by the Defendants. Investment interests for the IRRC were promoted within a broader scheme consisting of investment promoters, developers, loan agents, and established banking partners.

111. Being fully aware of the investment opportunity, MIP and McCleery agreed to promote the investment opportunity for and in behalf of Drake, Snider, and WSS/Tri Global.

112. Under this arrangement, MIP and McCleery acted as agents for Drake, Snider, and WSS/Tri Global.

113. MIP began promoting the investment as early as 2006.

114. In addition to the promotion of the investment, MIP and McCleery passed along updates from Drake, Snider, and WSS/Tri Global to the investors regarding the progress of the

development. Additionally, they answered many of the questions investors had regarding the development, even after committing to invest.

115. John Does 1-5 held ownership interests in MIP, were aware of the IRRC scheme, and materially aided MIP and the other Defendants in defrauding Plaintiffs.

### The Role of Shirato and the Shirato Indian Ridge Business Entities

116. Without Shirato and the Indian Ridge Business Entities, the Plaintiffs' investments in the IRRC could not have taken place.

117. Shirato is the principal and owner of the Shirato Indian Ridge Business Entities. Shirato and the Shirato Indian Ridge Business Entities are the original owners of thousands of acres surrounding Table Rock Lake in southwest Missouri, comprising the IRRC. Shirato and the Shirato Indian Ridge Business Entities are the master planners, developers, and owners of land in the IRRC.

118. It has been estimated that the entire Indian Ridge Resort is a $1.6 billion development. With a ten-figure price tag, Shirato and the Shirato Indian Ridge Business Entities required investor financing to successfully develop the IRRC.

119. To obtain financing, Shirato and the Shirato Indian Ridge Business Entities enlisted the assistance of other builders and developers to finance and develop smaller pockets of development within the broader development.

120. As such, Shirato and the Shirato Indian Ridge Business Entities were jointly involved with Drake, Snider, WSS/Tri Global, MIP, McCleery, and Clarkson in orchestrating an investment scheme involving out-of-state investors as credit partners in the IRRC.

121. Drake and Snider met with Shirato and the Shirato Indian Ridge Business Entities regarding the IRRC around the end of 2005 or earlier.

122. Drake and Snider described their investment pitch, explained *supra*, to Shirato and the Shirato Indian Ridge Business Entities.

123. Drake and Snider met numerous times with Shirato and the Shirato Indian Ridge Business Entities. Ultimately, Drake and Snider purchased the lots in Tract 34 from Shirato through North Shore.

124. On information and belief, Drake and Snider used the funds from the Plaintiffs' and other investors' construction loans to pay for the lots purchased.

125. From this point forward, Shirato and the Shirato Indian Ridge Business Entities were a part of the financing scheme for the IRRC.

126. Shirato and/or the Shirato Indian Ridge Business Entities co-signed with Drake, Snider, and North Shore on the development bond for Tract 34. Shirato introduced Drake and Snider to Gary Fruits at Columbian Bank, to help them establish a lending partner for the development of Tract 34.

127. Shirato and the Shirato Indian Ridge Business Entities assembled the marketing materials distributed to the community and prospective investors. Shirato and the Shirato Indian Ridge Business Entities took the lead with the local municipal governments for the necessary approval in moving forward with the project.

128. Shirato and the Shirato Indian Ridge Business Entities (along with other Defendants) represented directly or indirectly to the Plaintiffs that the broader Indian Ridge Resort was

substantially developed (including "Full Service Resort Hotel," "High-tech Convention Center," "The Third Largest Indoor Water Park in the United States," "Outdoor Water Park," "18-Hole Championship Golf Course," "Luxurious Golf Condominiums," "Deluxe Town House Condominiums," "Themed Retail Shopping Mall," "Casual and Fine Dining Restaurants," "Premier Day Spa," "Indian History Center," "Senior Gated Golf Community," "Private Resort Marina," and "Boating, Skiing, Fishing, Hiking, Biking, Shopping, Dining and much more!"), thereby making the investment appear viable, attractive and more valuable. In reality, the 1,000+ acres of the IRRC at the time was and currently is little more than pastures, woodlands, and a few graded acres.

129. Shirato and the Shirato Indian Ridge Business Entities were aware of their role in the scheme, participated in the scheme, and, but for Shirato and the Shirato Indian Ridge Business Entities' participation, the fraudulent acts perpetuated against the Plaintiffs would largely have not been possible.

**The Role of the Lending Partners
in the Indian Ridge Resort Development**

130. Central to the development of the IRRC was involvement of certain Lending Partners through which investors would obtain construction loans. Lawrence Bank was one of several banks involved as a Lending Partner.

131. Each Lending Partner, including Lawrence Bank, was informed of the following facts before agreeing to provide construction loans for the IRRC:

    a.    That the Plaintiffs were investors in the IRRC and that the construction loans

represented their investments and were designed to finance the construction of the IRRC;

b.   That the Plaintiffs were not seeking to build secondary residences but to receive a return on their investment through the credit partner investment scheme;

c.   That each loan was for a single unit, one side of a duplex, which was part of the overall IRRC;

d.   That many of the Plaintiffs were seeking to build multiple units, further indicating their investment intent;

e.   That all of the investors, including the Plaintiffs, were located outside the state of Missouri;

f.   That each Lending Partner would be working with and through Clarkson, Drake, Snider, Shirato, the Shirato Indian Ridge Business Entities, MIP, WSS/Tri Global, and North Shore to qualify and approve the Plaintiffs' construction loans;

g.   That *all* interest payments on the notes would be made by Drake and Snider;

h.   That the down payments for the loans would be made by third-party investors or, in the alternative, would be covered by an equity cushion in the loan. If payment was coming from a third-party investor, the funds would not be exchanged at closing, but receipt would be verified by a letter from Drake and Snider;

i.   That as a result of all payments being made by Drake, Snider, WSS/Tri Global, North Shore, and MIP, *on behalf of the Plaintiffs*, the construction loans were essentially proxy loans on the Defendants' behalf.

j.      That all loan schedules were being sent directly to Drake, Snider, Clarkson, WSS/Tri Global, North Shore, and MIP, instead of the Plaintiffs;

k.      That all draw requests and proceeds were coming from and paid directly to Drake, Snider, WSS/Tri Global, North Shore, and MIP;

l.      That the duplexes would be sold to final purchasers or retained so the initial investor could participate in a profit-sharing system based on rental receipts; and

m.      That construction on the duplexes would be complete in four months' time, enabling the bank to sign additional loans every four months.

132. Columbian Bank funded a few loans before referring Drake and Snider to Wells Fargo. This referral was made based on a complete understanding of the investment scheme, the scope of the project, and the belief that it was a good fit with Wells Fargo's portfolio.

133. Drake and Snider met with Wells Fargo representatives, including Jenna Fullerton, and discussed the overall investment.

134. It was explained that the investors were being sought to provide the credit necessary to secure construction loans for the development of the duplexes on Tract 34 of the IRRC.

135. It was explained that investors were given two investment options: (1) participate in a profit-sharing arrangement based on rental receipts, or (2) have the properties sold upon completion to pay off the construction loan.

136. At the time of agreeing to provide financing, Wells Fargo understood the items outlined in paragraph 131 *supra*.

137. Wells Fargo agreed to provide the financing for the project, including construction loans

and permanent financing upon completion, fully understanding that the properties were going to be sold once completed and, until their sale, that Drake and Snider would continue to make payments on the loans.

138. For one reason or another, Wells Fargo decided to share the investment opportunity with Lawrence Bank.

139. Wells Fargo began forwarding loan files to Lawrence Bank with the understanding that Wells Fargo would still provide the permanent financing once construction was complete.

140. For some of the loans, Lawrence Bank used the loan application materials provided by Wells Fargo to approve the construction loans for the Plaintiffs, even though they had tax returns and financial statements from each of their prospective borrowers.

141. Drake and Snider met with Clark of Lawrence Bank and informed him of the investment scheme as they had done with Columbian Bank and Wells Fargo.

142. Before agreeing to provide the construction loans, Clark went to inspect the IRRC.

143. Clark and Les Dreiling, president of Lawrence Bank, met with Shirato and representatives from Wells Fargo, Mike Platt and Shane Podliska, in October 2007 at the IRRC. During this meeting, Clark saw the beginnings of curbing and roads leading into the IRRC; however, Clark did not see any indication that improvements, such as roads, electricity, sewer, etc., had been made, or even begun, on Tract 34.

144. Clark also met Kip Hurley from Great Lakes at this October 2007 meeting.

145. The unimproved condition of the lots was later confirmed by appraisal reports indicating the lack of improvements. Each report indicated that the appraised value was based on

hypothetical conditions.

146. Lawrence Bank ultimately agreed to provide funding and accepted the same terms agreed to by Wells Fargo.

147. Lawrence Bank's acceptance of the investment scheme and loan terms is shown in various emails between Clark, Clarkson, Kip Hurley, Shane Podliska of Wells Fargo, and Mike Platt of Wells Fargo, including, but not limited to, emails from November 1, 2007 to November 16, 2007.

148. In addition to the items listed in paragraph 131 *supra*, at the time of agreeing to fund the construction loans, Lawrence Bank was informed that Wells Fargo would provide the permanent financing for each loan.

149. During the loan approval process, the Lending Partners, including Lawrence Bank, had the following:

    a.    Appraisal for the lot, which indicated that there were no improvements on the property as of the date of the appraisal;

    b.    A loan application from each Plaintiff, which stated the assets and liabilities of the investors. On numerous applications, Clarkson or agents of the Lending Partner changed the numbers on the loan applications based on the Lending Partners' requests and with their knowledge;

    c.    Personal financial statements and current tax returns were provided by each Plaintiff. On information and belief, no information was altered on these forms by Clarkson or agents of the Lending Partner. In many circumstances, these

documents revealed that the Plaintiffs lacked the requisite income and net worth

to otherwise qualify for the amount loaned and borrowed. The Lending Partners

knew or had reason to know that the Plaintiffs' loan-to-value ratios were grossly

overstated. These documents further revealed each investor's inability to make the

monthly interest payments; however, none of the Lending Partners were

concerned with the Plaintiffs' inability to make the interest payments as they had

been assured that all interest payments would be made by Drake and Snider

through one of their many companies;

d.     Independent inspection conducted on each lot to ensure the Lending Partners' first

priority under applicable lien laws. This inspection again revealed that no

improvements were located at the lot or even run to the edge of the development

site, Tract 34. This inspection also revealed that no roads, curbs, or gutter existed

on the development site;

e.     Knowledge regarding who owned the other half of the duplex being financed by

them. For example, Lawrence Bank was aware that the lot financed by the

Hadlocks did not have an additional investor to develop the other half of the

duplex, making it impossible to begin construction on the lot. Lawrence Bank was

aware of the same circumstances for the lot owned by Tim and Marianne Brent.

Lawrence Bank was also aware that John Brent was the owner of both sides of his

duplex, even though financing was being provided by another lending partner,

further indicating that the loans would be for investment purposes and not for

secondary residences.

150. The loans were initially categorized as commercial loans by the Lending Partners despite any notes within the documents stating the purpose as "construction of secondary home located in Branson [West], MO."

151. The Lending Partners, including Lawrence Bank, were fully aware of the investment scheme, the overall development, and the purpose for which the investors were seeking financing.

152. The construction loans for which the Plaintiffs were approved were not customary loans but were loans with terms created specifically for the IRRC. These loans and terms were only available to individuals investing in the IRRC with Drake and Snider.

153. Lawrence Bank either knew of or willfully disregarded the discrepancies between the income documents provided by the Plaintiffs and the loan applications submitted by Clarkson, Drake, Snider, McCleery, Shirato, North Shore, MIP, and WSS/Tri Global.

154. On information and belief, Lawrence Bank was excited by the IRRC and the potential for them to make large amounts of money by closing additional loans every four months and having the interest payments guaranteed by Drake and Snider.

155. The value of the loans was based on the improved status of the lots, which inflated the value of the loan, thereby enabling each bank to claim an equity cushion in the loan, relieving any anxieties of the need for a real down payment.

156. Additionally, the loans were characterized as being for "personal, family, or household purposes or personal investment," enabling each bank to charge a higher interest rate and have a

smaller down payment requirement. These factors made it easier for each Plaintiff to qualify for funding, despite their lack of assets or the enormity of the liabilities.

157. Lawrence Bank provided the documents necessary for closing to Great Lakes along with instructions.

158. However, these instructions did not include provisions regarding the down payment to be made by or on behalf of the buyer.

159. Instead, when the title companies questioned the Lending Partners regarding the down payment, they were informed to follow their instruction sheet and not be concerned with verifying the down payment.

160. The Lending Partners had agreed with Drake and Snider to accept, as proof of a down payment, a letter from Drake and/or Snider indicating that the down payment had been received. The Lending Partners did not require proof from Drake or Snider as to the payment being received, *other than the letter*.

161. Indeed, in the settlement statement between Lawrence Bank and the Plaintiffs, the down payment, or "deposit or earnest money" is stated to be paid by *or in behalf of* the borrower, meaning that there was some understanding that the developers, Drake and Snider, would pay the down payment amount on behalf of the individual borrowers.

162. In reality, the Lending Partners were not concerned with the down payment actually being exchanged because they had a built-in equity cushion on each loan.

163. Further, the Lending Partners made material misrepresentations on the loan documents themselves.

164. The construction loan agreements, prepared by the Lending Partners, including Lawrence Bank, in conjunction with the title companies, including Great Lakes, and signed by the Plaintiffs, include language that by signing the agreement, the borrower is representing that improvements are located on the property at the time of closing.

165. At the time the closing documents were prepared, the Lending Partners, including Lawrence Bank, and Great Lakes, knew that the Plaintiffs were from out-of-state and had never travelled to physically see the status of the lots.  Indeed, all of the Defendants knew that the Plaintiffs were from out-of-state and had never seen, nor intended to see, the project because they were simply involved in the IRRC for short-term investment purposes.

166. Based on the information available to the Plaintiffs, the Plaintiffs fully believed that the improvements were located in the development and on each of their lots.

167. The Lending Partners, however, knew that there were no improvements on any of the lots, based on their own independent inspections and the appraisals included in the loan files.

168. This language was intentionally included by each Lending Partner because the hypothetical presence of the improvements permitted them to inflate the value of the loans. Further, this enabled the Lending Partners to release funds based on the existence of the improvements, fully knowing there were no improvements on the property, thereby perpetuating the fraud to the Plaintiffs.

169. Additionally, at closing, the Lending Partners permitted approximately *half* of the loan proceeds to be disbursed, fully knowing that no improvements existed on the property.

170. Lawrence Bank was fully aware that at least a portion of the loan proceeds disbursed

were being used to develop the overall IRRC and not solely used on the borrower's lot.

171. Further, the Lending Partners knew that no work had begun on the lots at the time of closing and that no work had been completed between the time of closing and the first draw request.

172. The first draw request made by Drake and Snider for each lot was for the hook-up fees for the water, sewer, gas and electricity and for building permits. These items should have all been covered by the initial construction draw of approximately $98,000.00 and the additional funds received as a down payment from third-party investors of approximately $97,000.00.

173. At the time these requests were made, the Plaintiffs fully believed that the lots were improved, justifying an expense to hook-up the water, sewer, gas, and electricity. The Lending Partners, however, were fully aware that the lots had not been hooked-up to any improvements because no improvements existed in the development. Indeed, the Lending Partners, including Lawrence Bank, knew the hook ups for the water, sewer, gas, and electricity for each individual lot, as detailed in the initial draw requests from Drake and Snider, were impossible due to the complete lack of these utilities and other improvements on Tract 34.

174. The Lending Partners were fully aware of the fraudulent representations being made to the Plaintiffs and continued to fund the fraud by disbursing funds when their own inspections revealed that work had not been completed.

175. In fact, it was common knowledge in and around Branson West, Missouri that a dispute existed between Stone County, Missouri and the City of Branson West regarding running utility lines to the IRRC.

176. In addition to the first draw request, the Lending Partners permitted excessive amounts of loan proceeds to be disbursed for relatively little work completed. In some cases, 75 percent of the loan proceeds had been disbursed when only 25 percent of the work on the structure had been completed.

177. The Lending Partners were further aware or had reason to know that the draws from the Plaintiffs' construction loans were being used by Drake, Snider, Shirato, the Shirato Indian Ridge Business Entities, MIP, WSS/Tri Global, and North Shore to make the loan mortgage and interest payments.

178. Clark, from Lawrence Bank, made four visits to the construction site in addition to the independent inspection reports that were being conducted to verify work being completed.

179. Clark received the independent inspection reports on a monthly basis.

180. Clark knew that little to no work was being completed on the lots specifically funded through Lawrence Bank, despite the large sums of money disbursed from the loans. Clark was further aware that the development of the overall IRRC was not taking place.

181. Further, Clark received a letter from Drake on February 20, 2008, stating that the structures were no longer going to be modular units built off site. Instead, construction for the units would be taking place on site.

182. This letter put added emphasis on the construction inspection reports provided to Clark each month, as he would be able to monitor *all* progress on each lot through the inspection reports.

183. Clark informed Drake and Snider of his displeasure but did nothing more to ensure that

work would be completed. Further, Clark failed to inform any of the Plaintiffs that work had not commenced on their lot(s) because Drake and Snider were still making the interest payments.

184. None of the duplexes were built in the promised four-month building time, and each of the Plaintiffs had to seek extensions on their loans.

185. At the time of granting an extension, the Lending Partners were fully aware that (1) construction on the various lots were not complete—if any construction had begun—although the loan had been opened for six to nine months, (2) there were still no improvements located in the development, let alone running to the individual lots, (3) the majority of the loan proceeds were disbursed, despite the minimal amount of work completed on the lot, and (4) Drake and Snider were still making the interest payments.

186. The Lending Partners did not inform the Plaintiffs of the lack of construction on their lots before approving the extensions because Drake and Snider were still making the interest payments.

187. On information and belief, so long as Drake and Snider continued to make the interest payments on the loans, the Lending Partners were not overly concerned about the amount of progress being made at the construction site.

188. Eventually, Drake and Snider began making interest payments late, and the relationship between Clark of Lawrence Bank and Drake and Snider deteriorated.

189. Clark began contacting Clarkson and requested that he demand interest payments from Drake and Snider.

190. At the point when Drake and Snider completely stopped making interest payments,

Lawrence Bank contacted the Hadlocks, the Preszlers, the Brents, and John Brent to make interest payments.

191. The Plaintiffs attempted to make some interest payments to protect their credit rating but were ultimately unable to continue doing so.

192. Lawrence Bank was fully aware at the time of approving the loans that the Plaintiffs would not be able to make the interest payments on the loans.

193. Despite the lack of progress on each lot, the extension of the loans, and the deteriorating relationship due to late payments by Drake and Snider, Lawrence Bank made additional disbursements on John Brent's loan and the Preszler's loan.

194. Without the participation of the Lending Partners, the Plaintiffs' investments in the IRRC could not have taken place. The Lending Partners were aware of their represented roles in the scheme, performed in compliance with the purported role in the scheme, and, save for the banks' participation, the fraudulent acts perpetuated against the Plaintiffs would not have been possible.

195. Lawrence Bank provided funding for the Preszlers, Hadlocks, Brents, and John Brent.

### Facts Particular to the Arnsons

196. The Arnsons entered into the credit partnership (investor) agreement with MIP in 2006.

197. Per the terms of the agreement the Arnsons were required to proceed with loan applications using their social security numbers and credit.

198. The agreement also required the Arnsons to fill out the necessary applications, provide required documents, attend the closing, and take all necessary steps to secure the mortgage.

199. The agreement required MIP to pay the Arnsons $10,000.00 per duplex financed and to

make all payments on the mortgage note.

200. The Arnsons initially signed up for one duplex as a credit partner, but later added a second as a credit partner and planned on receiving $10,000.00 for use of their credit.

201. To reserve the spots, the Arnsons paid $6,000.00 to MIP to reserve the first duplex.

202. After entering into the agreement with MIP the Arnsons began the process of working with MIP and Clarkson to secure the financing for the project.

203. The Arnsons began exchanging several emails with McCleery and Clarkson to gather the necessary information to prequalify for the required financing.

204. The Arnsons provided all of the required information which consisted of the typical documents needed for loan approval: tax returns, pay stubs, bank statements, etc.

205. During this same time period the Arnsons received updates from McCleery on the status of the IRRC as well as plat maps and other information needed to secure the loans.

206. In August 2006 and early September 2006, the Arnsons were assigned lots in the project to invest in and develop. Shortly thereafter, they received appraisals on the investment lots.

207. Originally the financing was to be obtained through Top Dot lending company. However, on December 4, 2006, the Arnsons were informed MIP would be moving forward with new lending partners and would no longer be working with Top Dot.

208. On December 8, 2006, the Arnsons were notified that MIP was moving forward with Columbian Bank out of Kansas.

209. MIP provided the Arnsons with a Personal Financial Statement form and requested that they fill it out and return it along with other requested documentation.

210. Clarkson worked directly with Columbian Bank on the loan and all documents and applications were funneled through Clarkson to Columbian Bank and other lending institutions.

211. On January 31, 2007, McCleery notified the Arnsons that they had received approval from Columbian Bank on the IRRC.

212. On February 9, 2007, the Arnsons executed a Warranty Deed for the Branson West property at Charger Title in Utah.  The Warranty Deed conveyed title to the IRRC property from Jim Shirato and North Shore Investments, LLC to Greg and Sarah Arnson.

213. In February 2007, Drake and Snider made regular trips to Utah to "update" investors on the IRRC and inform them of other projects WSS/Tri Global was beginning.

214. On March 21, 2007, the Arnsons received an email from WSS updating them on the project explaining that roads were going in and WSS was gearing up to begin excavation work on the lots.

215. The email also informed the Arnsons that as owners of the property in IRRC they would be receiving a form from the Stone County Assessor's Office. The email assured the Arnsons they did not have to fill out the form or worry about any fees; that WSS would take care of it.

216. Also on March 21, 2007, the Arnsons received an email from MIP explaining that there had been some complications with financing, but that a letter from Clarkson was attached explaining the situation.

217. The email went on to say that the letter shows financing at 90 percent loan to value ("LTV"), but that the true cost was 85 percent LTV and that Clarkson had made the change so not as many assets would be required to secure each loan.  MIP explained that the 5 percent

would never be drawn, that when the construction was complete the 5 percent would go back to the Lending Partner and everything would be fine.

218. The attached letter from Clarkson explained that due to delays with Columbian Bank he was pursuing new lenders. Clarkson outlined the new guidelines explaining the sales price would equal the value of the unit, all construction loans would be at a 90 percent LTV, all construction loans would be Stated Income/Verified Asset loans, and that 10 percent down would be required at closing.

219. The letter from Clarkson explained the sale price would equal the appraised value, all construction loans would be 90 percent LTV, a 10 percent down payment would be required at closing, but would be made by a third party, and that all interest on the loan would be paid by the builder.

220. On May 4, 2007, the Arnsons received an email from WSS outlining the progress on the IRRC.

221. The email explained that:

    a.    "[F]oundations should start in 2 weeks, with home deliveries in about 3-4."

    b.    "[A] few of the lots [were] loaded in the MLS so that presales on the finished product can begin! They have a ton of interest, and we expect a huge boom when the first structures are erected within the next 45 days!"

222. Throughout May and June 2007, the Arnsons received several emails from MIP and Clarkson explaining problems with closing the financing on the project. These problems were blamed on increased regulation from the government.

223. On July 10, 2007, Clarkson sent the IRRC investment contracts to the Arnsons and the authorization form from Wells Fargo for them to sign for the closing.

224. The contracts showed that a down payment needed to be made, but MIP assured the Arnsons that the payment would be made for them and no money would come out of their pockets.

225. As a result of the delay in securing financing, the Arnsons signed contract extensions on July 31, 2007, with North Shore which currently owned the property and is affiliated with WSS.

226. On August 13, 2007, the Arnsons received an email from Clarkson explaining that he had stated their monthly income as $21,000.00 "to cover all debt and make the ratios work." He explained that "if the info is pretty close to being correct you won't hear from Wells Fargo."

227. The Arnsons informed Clarkson that their monthly income was overstated and that they would not perpetuate the fraud.

228. On August 31, 2007, the Arnsons received an update on the construction progress of the IRRC explaining that excavation was moving forward and that "we will set the first 14 duplexes in 3-4 weeks."

229. On September 4, 2007, the Arnsons received the permit application for their lots, which they promptly completed and returned.

230. On September 6, 2007, the Arnsons secured the required insurance on the project and had the policies forwarded on to Wells Fargo and WSS.

231. On September 10, 2007, the Arnsons received another update on construction progress of the IRRC and an assurance that the delays in financing had not stopped progress on the

development.

232. On September 12, 2007, the Arnsons received an email requesting that once they received payment coupons for the loan that they immediately forward them on to WSS so that WSS could make the loan payments without delay.

233. On September 18, 2007, the Arnsons received notice from Clarkson that they had received approval from Wells Fargo to close.

234. The Arnsons signed closing documents at Charger Title in Utah on or about September 20, 2007.

235. On September 19, 2007, MIP wrote a check for $10,000.00 to the Arnsons, which represented the $5,000.00 credit partner fee for each unit.

236. The Arnsons continued to receive updates on the IRRC explaining that work was moving forward and on January 14, 2008, pictures of the first framed duplexes were sent out with assurances that the 78 additional duplexes would be going up soon.

237. Based on the apparent progress of the development the Arnsons continued forward with securing financing on a second duplex and applied for two loans through Columbian Bank once again, each in the amount of $388,000.00.

238. The Arnsons once again worked exclusively through Clarkson, McCleery, and MIP to secure these loans and all documents were funneled through Clarkson to Columbian Bank.

239. On February 27, 2008, the Arnsons received notice that WSS was now Tri Global and that all work previously carried out by WSS would be performed by Tri Global.

240. After this announcement, Tri Global began sending periodic newsletters updating the

progress of the IRRC showing pictures of duplexes being built.

241. These newsletters created the impression that work was moving forward on the project and that each individual duplex was well on its way to completion.

242. On March 4, 2008, the Arnsons received an email from McCleery informing them that work on the project had been delayed due to severe weather and that the Arnsons' lot would be one of the last to be completed.

243. McCleery reassured the Arnsons that this would not be a problem and that Clarkson would work with the bank to transfer their project to a lot which would be completed sooner.

244. On March 24, 2008, the Arnsons were informed that Columbian Bank had approved the transfer of their lots, that their new lots were 40A and 40B, and that the change would accelerate the construction of the duplex they were financing.

245. On May 1, 2008, Tri Global provided documentation which they represented would transfer all obligations previously owed by WSS to Tri Global and that all projection costs and draw sheets would remain the same.

246. The Arnsons were concerned about language in the contracts dealing with buying the units for the appraised value instead of for the LTV value and questioned McCleery about this.

247. McCleery explained that the differences were because MIP or the *builder had made the down payments* and that the contracts had to be for the full value because the equity from the down payment had to be included.

248. McCleery assured them that everything was fine and that the transition from WSS to Tri Global would not cause any change in the project or their relationship to the project.

249. Throughout the Spring of 2008, the Arnsons received repeated notices that construction was behind schedule due to extreme weather and that if the lending partners contacted them about progress statements, to forward them on to Tri Global and that they would be handled.

250. Tri Global and MIP continued to act as the intermediary between the Arnsons and the lending institutions.

251. On August 25, 2008, the Arnsons received notice from the FDIC that Columbian Bank had been closed by the State Bank Commissioner of Kansas and that the FDIC had been appointed as receiver.

252. On September 1, 2008, the Arnsons received an email from McCleery notifying them of her resignation from MIP. She stated the reason for her departure was due to the lack of access to proper information, which resulted in her not being able to do her job correctly. The email notified the Arnsons that all future communications should be made to MIP directly.

253. After the FDIC took control of Columbian Bank all construction distributions were stopped and the accounts were frozen. As a result, on September 17, 2008, the Arnsons received an email from Drake of Tri Global explaining that since there were no more construction distributions that Tri Global would no longer be making the interest payments on the loans as originally promised.

254. In this same email, Drake attempted to blame the FDIC for the failures of the IRRC and stated that "Everyone should be angry at the way the FDIC is handling this" and went on to say that "it is wrong to shut construction loans off midstream."

255. This resulted in the Arnsons being required to make interest payments to prevent their

loans from going into default and negatively affecting their credit.

256. It was later discovered that much of the construction work which had been represented by MIP and WSS/Tri Global to have been completed had not been completed and the construction distributions which had been issued by Columbian Bank and Wells Fargo had not gone towards the construction of the project as represented.

257. On information and belief, the money was used to pay the interest payments on the construction loans (as interest payments stopped being made the instant construction distributions stopped) and the majority of the monies not used for interest payments were pocketed by MIP and/or WSS/Tri Global.

258. To remedy the situation which had been created by MIP and WSS/Tri Global's failure to make the interest payments as promised and finish the project, the Arnsons began negotiating with a possible third party to purchase the project.

259. Nothing resulted from these negotiations and the Arnsons were left with loan obligations of at least $230,000.00 per unit on four units and the accompanying interest payments. The construction on these units to this day has not begun.

260. On October 15, 2008, the Arnsons received loan extension documents from Wells Fargo to postpone the loans being called due as the Arnsons sought a resolution of the problem.

261. On November 24, 2008, the Arnsons received a Formal and Final Demand from the FDIC calling the two loans previously held by Columbian Bank due. The amounts owing on the first loan from Columbian Bank was $296,066.26 and the second loan from Columbian Bank was also $296,066.26.

262. On December 1, 2008, the Arnsons received a similar letter from Wells Fargo stating they were in default on the two loans from Wells Fargo, and failure to correct that default would result in the loans being called due on January 1, 2009.

263. On January 21, 2009, the Arnsons received a follow-up letter from Wells Fargo seeking repayment of the entire amount due on the two Wells Fargo loans; the first in the amount of $229,297.14, the second in the amount of $232,423.53.

264. As a result of entering into the agreements with MIP, WSS, and WSS/Tri Global which were to provide them a completely finished and furnished duplex and $10,000.00 for the second duplex, the Arnsons have loans being called due which totaled $1,053,853.10 and have nothing to show for it because the two unfinished lots in Branson West, Missouri have been foreclosed on through judicial proceedings (see footnote 1 on page 15 of this Complaint).

### Facts Particular to the Bilbros

265. The Bilbros became directly involved with the IRRC through MIP in July 2006.

266. On July 5, 2006, MIP sent four reservation (investment) agreements to Casey Bilbro for his signature along with a request for the $12,000.00 to secure his reservation as an investor.

267. Casey promptly filled out the investment agreement and sent a payment to MIP for $12,000.00.

268. McCleery confirmed receipt of the requested information and payment on July 14, 2007, and informed Casey that Clarkson should already have his documentation for the loan to securing financing for the four units.

269. Casey's pre-qualification documents for the loans were submitted on July 20, 2006, by

MIP and Casey was informed by McCleery that he should expect a phone call from Clarkson and that Clarkson would be handling all of the arrangements to secure financing.

270. Over the next month, Casey received updates on the progress of the IRRC and was sent a plat map to select the construction lots he wished to invest in.

271. Ultimately, Casey did not pick which lots he wanted to invest in, but was assigned which lots would be developed for him.

272. On August 23, 2006, MIP informed Casey that Top Dot Lending, the company name used by Clarkson, would be doing appraisals on the property within the week to secure the loans.

273. On September 14, 2006, MIP informed Casey that the appraisals had been completed and that they were higher than anticipated. MIP explained this meant that Casey would be experiencing greater returns on his investment and that once construction was complete he would be able to immediately have access to $45,050.00 per investment lot.

274. The next day, MIP provided Casey with an exit strategy for his investment and outlined how there were no real risks with his investment.

275. On October 6, 2006, Casey received an email from MIP explaining that the first closing group was ready and that he should have received a construction contract. The email explained that the construction contract was for the builder and bank and showed a breakdown of the costs and how the money would be disbursed.

276. The email explained that any earnest money or upfront payments would be covered by the builder and that he would not be required to put any money into the investment.

277. On October 9, 2006, MIP sent an email to Casey informing him that property values in

the area had increased 20 percent as a result of the new water park going in the area and the increased rental rate at other properties in the area.

278. On November 1, 2006, Casey sent an email to McCleery clarifying that he was only involved as a credit partner because it was much safer and there was less risk. He also informed her that he was downsizing from two full duplexes to just three units or one and a half duplexes and requested the return of the $3,000.00 reservation deposit.

279. At approximately this same time, Casey sent in all of the requested documentation to Clarkson to secure the financing for the project.

280. On November 15, 2006, MIP sent out a notice that five new banks were interested in joining as Lending Partners and that this could result in better rates and lower fees so the financing would no longer be with Top Dot.

281. On November 30, 2006, MIP notified Casey that more than 200 secondary investors were interested in purchasing the finished units he had invested in and that the project would be a great success.

282. On December 8, 2006, MIP notified Casey that Columbian Bank would be the bank providing the financing for his loan.

283. On January 25, 2007, MIP notified Casey that Clarkson was working directly with Columbian Bank and that closing should occur in the very near future.

284. At the beginning of February 2007, Clarkson began contacting Casey and requesting additional information to secure financing with Columbian Bank.

285. On March 21, 2007, Casey received an email from MIP notifying him of the change in

the setup of the financing and the that the LTV would be for 90 percent, but that the cost to him would still be 85 percent LTV so that he would not have to show an additional $25,000.00 in assets per unit (one side of a duplex) to qualify for the loans.

286. This email assured him that there were no problems with this arrangement and contained an attached letter from Clarkson further explaining the arrangement.

287. The letter from Clarkson explained the sale price would equal the appraised value, all construction loans would be 90 percent LTV, a 10 percent down payment would be required at closing, but would be made by a third party, and all interest on the loan would be paid by the builder.

288. MIP continued to send Casey updates on the project explaining what a huge success it would be based on the number of visitors traveling to Branson West.

289. On May 4, 2007, MIP sent Casey an email explaining that Wells Fargo may come on as a Lending Partner and that one of his duplexes might be financed through Wells Fargo.

290. On May 7, 2007, Casey received an update from MIP explaining the builders (WSS/Tri Global, Drake, and Snider) had met with the developers (North Shore, Shirato, and the Shirato Indian Ridge Business Entities) and that foundations would start going in within two weeks.

291. On May 25, 2007, Casey received a Good Faith Estimate of Settlement Costs from Wells Fargo.

292. On June 14, 2007, MIP notified Casey that the project was progressing nicely and that all of the engineering had been checked off, they were approximately two months from completing the infrastructure, and that the development of a water park and amusement park in the area was

improving property appraisals.

293. On June 21, 2007, MIP notified Casey that Wells Fargo had agreed to finance one completed condominium for him, that one side would be financed by Wells Fargo Bank, N.A., and the other side would be financed through Wells Fargo Home Loans. He was also informed that the loan files would be sent to the Lending Partner immediately.

294. On June 27, 2007, Casey was notified by Wells Fargo that subordinate financing was approved and that a home equity loan for $48,500.00 would be paid at closing.

295. On the same day, Wells Fargo sent several documents for Casey to sign to move forward with the loan. The next day, Clarkson sent a credit form for credit authorization for Wells Fargo.

296. On July 3, 2007, Casey received notice from MIP that MIP had received approval on some of the lots and closing would begin next week.

297. On July 20, 2007, before the loans were closed, Wells Fargo sent a draw request to Casey for his signature authorizing a total withdrawal of $55,058.20 for Water/gas/sewer hook-up, lumber, survey, and permits. Casey signed these documents and returned them fully expecting the money to be used for the items as listed on the requests.

298. It was later discovered that the money was not used for these purposes.

299. On or about July 25, 2007, the closing was carried out at Charger Title in Utah and the Warranty Deed was subsequently filed with Stone County, Missouri on August 6, 2007.

300. Carol Bilbro only co-signed on the loans based on representations that Missouri required the husband's and wife's name to appear on the note.

301. On July 27, 2007, Casey received documentation from Hogan Land Title Company on

the loans from Wells Fargo for lots 78A and 78B.

302. The HUD statement for Lot 78A referenced the construction draw for $55,058.20 to WSS. $16,531.20 of this amount was specifically referenced as a 10 percent deposit for the modular home.

303. In reality, modular homes were not used, no wood or other product has been delivered for Lot 78A, but Casey has never been returned these funds.

304. On information and belief, the money was received by Vickie Drake and then split between her, Drake, and Snider.

305. The HUD statement for Lot 78B referenced a down payment to WSS of $48,500.00. This amount was not exchanged at the time of closing nor was it made by the Bilbros at any other time.

306. The documentation showed that the borrower had paid $55,147.00 on the first loan and $53,845.50 on the second loan. In reality these amounts had been paid by a third party, there was no instruction as to the down payments at closing, and no checks were exchanged between the parties.

307. On August 1, 2007, Clarkson sent Casey a request for disbursement from Jenna Fullerton at Wells Fargo authorizing a disbursement of $88,120.00. Casey signed this and returned it promptly believing it would be used for the construction of his units.

308. On August 6, 2007, Casey was notified by MIP that closing had taken place on his project and that he should be receiving his partnership check within the week.

309. At this time, Casey began to receive regular updates from WSS updating him on the

progress of the development.

310. On August 31, 2007, WSS informed him that construction was progressing nicely and that roads were going in.

311. On September 11, 2007, Casey received his partnership payment from MIP in the amount of $9,842.50 which covered his $10,000 payment and $6,000 reservation refund, minus the title checks received from Hogan Title and title fees.

312. On September 12, 2007, Casey received a request from WSS to immediately send in any payment coupons he received from Wells Fargo as WSS would make all of those interest payments.

313. Casey was informed that financing for his third unit would be with Lawrence Bank.

314. On October 10, 2007, Casey received a credit authorization request form from McCleery for the Lawrence Bank loan requesting that Casey sign the document and returned it to Clarkson so that it could be processed with the bank.

315. On October 12, 2007, McCleery sent financial statement forms for Casey to fill out with instructions that they be sent to Clarkson so that he could review them and then submit them to Lawrence Bank.

316. On October 31, 2007, Casey received an email from MIP requesting that an address change be submitted to Wells Fargo so that all interest statements and required payments would be sent directly to WSS. Casey promptly made the changes as requested.

317. On November 11, 2007, Casey received a Line Item Disbursement Schedule and Request form from Wells Fargo which stated in bold letter that "all disbursements will be released based

on work completed as stated by a WFHM inspector."

318. This information led Casey to believe that no money would be released by Wells Fargo unless the construction was progressing as represented by Drake, Snider, WSS/Tri Global, and North Shore, and *upon inspection* of the work by Wells Fargo.

319. On November 29, 2007, MIP sent Casey the Real Estate Partner Agreement for his signature which clearly states that MIP "shall receive bills for and make all mortgage payments on the mortgage note."

320. This document assured Casey there would be no out of pocket expenses for the IRRC.

321. For the next several months, Casey continued to receive updates from WSS/Tri Global, North Shore, MIP, McCleery, Clarkson, Drake and Snider on the progress of the development which represented that the roads were in and the building was moving forward on the project.

322. On May 5, 2008, Casey received contracts from Clarkson which transferred all duties and obligations from WSS to Tri Global and made the conversion from WSS to Tri Global final.

323. On July 11, 2008, Casey received another update from WSS/Tri Global on the progress of the IRRC. This update differed from the past in that it gave information on a lot by lot basis.

324. This update informed Casey that no actual construction had taken place on his lot, the foundation had not been poured, and excavation work still needed to be done.

325. WSS/Tri Global already made draws on the two loans for $139,700.00 and $225,102.00 even though no actual construction had taken place.

326. On August 25, 2008, Casey was sent a Change in Terms Agreement from Wells Fargo to extend the loan and to reduce the amount from $436,500.00 to $388,000.00 as the time period for

the construction loan had expired.

327. Wells Fargo was aware that no work had been completed on either lot and failed to inform the Bilbros. On information and belief, Wells Fargo was unconcerned with the amount of work that had been completed because Drake and Snider were currently making interest payments on the loan and had promised to continue making the payments.

328. Shortly thereafter, on September 1, 2008, Casey received notification from McCleery that she was resigning from her position at MIP.

329. She represented that she was resigning because she was not being provided access to information which was necessary for her to perform her job appropriately.

330. To remedy the situation which had been created by MIP, WSS/Tri Global, North Shore, Drake and Snider's failure to make the interest payments as promised and finish the project, Casey began negotiating with a possible third party to purchase the project.

331. Nothing resulted from these negotiations, and Casey was left with loans of approximately $365,000.00 in exchange for nothing but a partially excavated lot which was encumbered by several liens and is now foreclosed through judicial proceedings (see footnote 1 on page 15 of this Complaint).

332. On December 1, 2008, Wells Fargo sent a notice to Casey informing him that he was in default and would need to cure the default before January 1, 2009 to avoid collection proceedings.

333. On January 1, 2009, Wells Fargo sent a Notice of Default and Demand for Payment on one of the loans in the amount of $227,813.18.

### Facts Particular to the Preszlers

334. The Preszlers became directly involved in the IRRC in July 2006.

335. On July 3, 2006, the Preszlers received an email from McCleery officially announcing the IRRC.

336. Shortly thereafter, the Preszlers provided McCleery with their payment and (investor) reservation agreements.

337. On July 13, 2006, the Preszlers sent financial information to obtain financing to McCleery to proceed with their investment.

338. McCleery referred the Preszlers on to Clarkson and explained that he would be handling all of the work in obtaining the financing.

339. On August 21, 2006, McCleery sent the plat map for the IRRC to the Preszlers so they could select lots in which to invest.

340. On September 18, 2006, the Preszlers received additional financial information requests from Clarkson for Top Dot lending to secure financing for the project.

341. On October 24 and 31, 2006, the Preszlers provided the requested information to Clarkson for financing purposes.

342. On November 28, 2006, McCleery forwarded a letter from WSS to the Preszlers about the IRRC and the tremendous interest it was receiving from other investors.

343. The letter explained the lack of risk and the security of making the investment.

344. Throughout the second half of 2006, the Preszlers received periodic emails and updates from MIP and WSS informing them of the advantages of the investment and the tourist

attractions going into the area.

345. On March 5, 2007, the Preszlers received an emailed request from McCleery that they provide additional financing information to Clarkson, and she explained that Clarkson would handle all financing with the Lending Partners or other lending institutions.

346. On March 21, 2007, the Preszlers received an email from MIP notifying them of a change in the setup of the financing and that the LTV would be for 90 percent, but that the cost to them would still be 85 percent LTV so that they would not have to show an additional $25,000.00 in assets per unit (one side of a duplex) to qualify for the loans.

347. The email assured them that there were no problems with this arrangement, and it contained an attached letter from Clarkson further explaining the arrangement.

348. The letter from Clarkson explained that the sale price would equal the appraised value, all construction loans would be 90 percent LTV, a 10 percent down payment would be required at closing but would be made by a third party, and that all interest on the loan would be paid by the builder.

349. MIP continued to send the Preszlers updates on the project explaining what a huge success it would be based on the number of visitors traveling to Branson West, Missouri.

350. On April 30, 2007, McCleery sent the Preszlers an email explaining that closing on financing should happen by mid-May.

351. On June 22, 2007, McCleery notified the Preszlers that the lender Clarkson had previously been using was no longer going to work and that MIP and Clarkson were pursuing financing from alternate lenders.

352. On August 13, 2007, the Preszlers provided Clarkson with a loan application to be submitted to Top Flight Lending.

353. Clarkson contacted the Preszlers on the same day and requested that they make changes to the document and include additional information.

354. The Preszlers complied with Clarkson's instructions and did everything they could to facilitate closing the financing on the project.

355. On August 23, 2007, the Preszlers signed the construction contracts for the project with WSS, submitted the completed Top Flight loan application, and signed a Wells Fargo Credit Authorization form.

356. On August 31 and September 14, 2007, McCleery sent additional updates on the IRRC regarding the excavation work and installation of roads in the development.

357. On November 12, 2007, the Preszlers sent a request to McCleery to withdraw from the investment and requested a refund of their $3,000.00 reservation fee.

358. McCleery immediately denied the request and informed the Preszlers that the only way they could get out of the agreement was if they failed to qualify for the loan.

359. On December 7, 2007, McCleery finally provided the Preszlers with the Credit Partner Agreement documents for signature. The Preszlers signed the MIP Partnership Agreement and secured a right to the $5,000.00 payment and additional assurances in the contract that all obligations on the loans obtained with the Preszlers' credit would be paid by MIP.

360. On December 17, 2007, the Preszlers received an email from Clarkson explaining that the construction loan with Lawrence Bank had been approved and the permanent financing with

Wells Fargo had also been approved.

361. In the email, Clarkson explained that to get the loans approved, he stated David's monthly income at $9,250.00 and Mary's monthly income from an LLC they owned at $3,000.00.

362. The Preszlers immediately responded to Clarkson's email saying that there was no income from the LLC and that this information was incorrect.

363. Clarkson attempted to explain that the discrepancy existed based on the way Wells Fargo broke down the income.

364. The Preszlers responded that they reviewed all of the information they provided for Wells Fargo and that the monthly income should still not be that high.

365. Clarkson responded that the information had already been submitted to Wells Fargo and that the Preszlers simply needed to state the values as Clarkson had reported.

366. The Preszlers responded that the information was incorrect, and, regardless of whether Wells Fargo would ask for proof or not, they were not willing to submit incorrect information as they believed Clarkson was requesting.

367. Clarkson responded that it was fine but that the permanent financing might have to be moved to another lender before the construction was completed.

368. On or about January 15, 2008, closing on the loans took place at Charger Title, and the Preszlers were assisted through the process by Leslie Peterson. On or about January 16, 2008, the Preszlers received a Warranty Deed for their investment property in the IRRC.

369. During the closing process, the Preszlers were assured by Peterson that no money down

was required.

370. The HUD statement notes a $97,000.00 payment by or on behalf of the borrower, with an additional $94,630.00 construction draw being paid to WSS/Tri Global.

371. Further, the promissory note contained the following language under representations and warranties regarding utility services:

> Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of the loan, and at all times any indebtedness exists:...all utility services appropriate to the use of the project after completion of construction are available at the boundaries of the Collateral.

372. The Preszlers fully believed that this representation was correct, based on the information they had received. Lawrence Bank, on the other hand, knew this statement was false, based on the appraisal and its own inspection conducted by Clark, but purposely included the language in the promissory note.

373. The Preszlers received the $8,000.00 payment owed to them shortly thereafter, which covered the $5,000.00 partnership fee and the $3,000.00 reservation fee.

374. On February 19, 2008, the Preszlers received the signed Real Estate Partner Agreement with MIP from McCleery.

375. During this time, the Preszlers continued to receive updates on the progress of the development and assurances that work was moving forward on the project.

376. On March 24, 2008, the Preszlers received a loan payment notice from Lawrence Bank indicating an interest payment was due on April 3, 2008, in the amount of $1,556.08.

377. The Preszlers emailed this notice to McCleery, and she assured them it would be paid.

378. The Preszlers also received notification that WSS would be changing its name to Tri Global.

379. On May 5, 2008, the Preszlers received contracts from Clarkson that transferred all duties and obligations from WSS to Tri Global and made the conversion from WSS to Tri Global final.

380. On May 13, 2008, the Preszlers received a notice from Lawrence Bank stating that an interest payment of $1,506.37 was past due and now had a late charge of $25.00.

381. The Preszlers once again forwarded this on to McCleery for payment.

382. On June 6, 2008, the Preszlers received an email from Clarkson explaining that extension documents for the Lawrence Bank loan needed to be provided to Lawrence Bank to stop foreclosure proceedings.

383. Clarkson stated in his email that the Preszlers did not need to be concerned with interest payments and that the builder would continue to make those payments as they always had.

384. The Preszlers executed the Change in Terms Agreement, extending their term date. At this time, Lawrence Bank was fully aware that little to no work had been completed on the Preszlers' lot and failed to inform the Preszlers. On information and belief, Lawrence Bank was unconcerned with the amount of work that had been completed because Drake and Snider were current in making interest payments on the loan and had promised to continue making payments.

385. On July 17, 2008, the Preszlers received draw requests for signature from Tri Global in the amount of $53,174.00, which they signed and promptly returned, believing it was necessary to keep the project moving and that the money was being used for construction on their investment lot.

386. Lawrence Bank disbursed the $53,174.00 to Tri Global, bringing the total disbursed on the Preszler's loan, to this point, at roughly $282,504.00, equal to approximately 72% of the total construction loan. This amount does not include the $97,000.00 payment made on behalf of the borrowers at closing. Lawrence Bank disbursed this money despite the July 2008 inspection report showing only 13.5% completion of the Preszler's investment property.

387. On August 28, 2008, the Preszlers received additional draw requests from Tri Global in the amount of $49,369.00, which they also signed believing it was necessary to keep the project moving forward and that the money was being used for construction on their investment lot.

388. Lawrence Bank disbursed the $49,369.00 to Tri Global, bringing the total disbursed on the Preszler's loan, to this point, at roughly $331,873.00, equal to approximately 86% of the total construction loan. This amount does not include the $97,000.00 payment made on behalf of the borrowers at closing. Lawrence Bank disbursed this money despite the August 2008 inspection report showing not additional progress since the previous inspection report (and disbursement) and showing only 13.5% completion of the Preszler's investment property.

389. On September 1, 2008, the Preszlers received notification from McCleery that she was resigning from her position at MIP and would no longer be involved with the company.

390. She represented that she was resigning because she was not being provided access to information which was necessary for her to perform her job appropriately.

391. To remedy the situation that had been created by MIP and WSS/Tri Global's failures, the Preszlers began negotiating with a possible third party to purchase the project; however, nothing resulted from these negotiations.

392. On September 23, 2008, the Preszlers received another payment notice from Lawrence Bank for $1,086.38.

393. The Preszlers forwarded this on to MIP for payment, but was informed that MIP would not be making the payment and that it was up to WSS/Tri Global to make the payment.

394. On September 24, 2008, the Preszlers received a letter from Lawrence Bank's attorneys demanding that interest payments be made.

395. The letter also made reference to a deposit or earnest money from the borrower on the loan and a deposit retained by the seller.

396. The Preszlers were somewhat confused and perplexed by this language as they had received repeated assurances that they would not be required to provide any money down for the project other than the $3,000.00 reservation fee.

397. Leslie Peterson at Charger Title had also assured the Preszlers that this was the case and that no money was required at the closing.

398. The Preszlers immediately contacted Lawrence Bank to inquire about this part of the letter and were informed by Clark of Lawrence Bank that $97,000.00 had been wired from David Preszler to Metropolitan National Bank.

399. Snider wrote a letter to Kip Hurley at Great Lakes on December 19, 2007 stating that WSS had received the funds for the down payment for lot 56B. However, the receipt for the wire transfer is dated January 3, 2008. Lawrence Bank knew that no payment was received at the time of the letter, based on this information, but did not bother to contact Drake or Snider regarding the discrepancy because it was not concerned about the existence of the down

payment.

400. The Preszlers did not know anything about this and contacted Drake at WSS/Tri Global to find out what this was all about.

401. Drake informed the Preszlers that all of the arrangements had been worked out with Lawrence Bank and that they were aware that all payments were being made by a third party who was not Dave Preszler.

402. On November 21, 2008, the Preszlers again extended the term of their loan.

403. On information and belief, Lawrence Bank agreed to extend the term of the note because it knew the lot the Preszlers invested in was worthless, the Preszlers were completely unable to repay the amount owed on the note, and that it was better to receive an interest payment than no payment at all.

404. On December 4, 2008, the Preszlers paid past due interest payments to Lawrence Bank in the amount of $4,652.22 to protect their credit and stop the bank from foreclosing on the lot representing their investment.

405. The Preszlers requested a loan activity statement from Lawrence Bank as, previous to this time all information had been sent to MIP or Tri Global.  The loan activity statement showed a total balance due of $332,023.00.

406. The Preszlers were very confused by this as they had only authorized two draws, one for $53,174.00 and a second for $49,369.00, totaling $102,543.00.

407. It was discovered that much of the construction work which had been represented by MIP and WSS/Tri Global to have been completed had not been, and the construction distributions

issued by Lawrence Bank had not gone towards the construction of the project as represented.

408. Any work performed on Lot 56B is not equivalent to the amounts drawn on the Preszlers' construction loan.

409. Lawrence Bank conducted inspection of the Preszler's property, revealing the amount of work completed each month.

410. The inspection report dated February 15, 2008 indicated that half of the "clear lot and rough grade" had been completed with 1 percent of the overall project complete.

411. The inspection report dated March 21, 2008 indicated that no additional work had been completed on the lot.

412. The inspection report dated April 23, 2008 indicated that no additional work had been completed on the lot.

413. The inspection report dated May 20, 2008 indicated that the "clear lot and rough grade" was complete as well as seven eighths (7/8) of the footings were completed. This report indicated that 5.5 percent of the overall project was complete.

414. The inspection report dated June 19, 2008 indicated that no additional work had been completed on the lot.

415. The inspection report dated July 17, 2008 indicated that the footings and foundation walls and piers were completed, along with one sixth (1/6) of the floor frame (joists) or slab. This report indicated that 13.5 percent of the overall project was complete.

416. The inspection report dated August 18, 2008 indicated that no additional work had been completed on the lot.

417. The final inspection report conducted by Lawrence Bank dated September 19, 2008 indicated that the floor frame (joists) or slab, subfloor, outside studs and top plates (including sheathing), inside studs and ceiling joists, and roof framing were complete, along with one sixth (1/6) of the roof sheathing and felt. This report indicated 27.25 percent of the overall project was complete.

418. At this point in time, approximately $330,000.00 had been drawn from the loan, or 85 percent of the entire loan. This does not account for the additional deposit of $97,000 purportedly received by WSS/Tri Global, Drake, and Snider for the project as shown by the wire receipt dated January 3, 2008. With this additional funding, Drake and Snider had received approximately 88 percent of the value of the property for completing only 27.25 percent of the construction.

419. It is believed that the money was used to make the interest payments on the bank loans (as interest payments stopped being made the instant construction distributions stopped), and the majority of the monies not used for interest payments were pocketed by MIP, McCleery, Clarkson, WSS/Tri Global, North Shore, Drake, and Snider.

420. As a result of the Preszlers' involvement with MIP and WSS/Tri Global, Dave had a loan in his name with a balance due of $332,023.00 and have nothing to show for it because the two unfinished lots in Branson West, Missouri have been foreclosed on through judicial proceedings (see footnote 1 on page 15 of this Complaint).

## Facts Particular to the Rippertons

421. The Rippertons became involved in the IRRC on March 1, 2007.

422. The Rippertons notified McCleery that they would like to become involved as investors in the IRRC on three units, or one and a half duplexes.

423. The Rippertons elected to enter into the profit sharing agreement on one of the units, and as a straight credit partner on the other two, receiving the $10,000.00 payment for use of their credit.

424. The Rippertons were attracted to the IRRC because of the representations made by MIP and McCleery that the construction of the units would be completed very quickly (in approximately three to four months) due to the fact that much of the framing was pre-fabricated.

425. On March 7, 2007, Matt made an inquiry to McCleery regarding the financing of the project and whether both he and Shufen needed to be included.

426. McCleery responded that only Matt needed to be included and that only his information would be necessary to secure financing for the project.

427. On March 14, 2007, McCleery confirmed that she had received a check for $6,000.00 from the Rippertons to reserve their spot as investors.

428. Matt began the process of filling out the loan application forms and providing the requested information to secure the financing.

429. On March 19, 2007, Matt questioned McCleery as to why the loan application he had been provided were pre-checked as a primary residence when the properties were investment properties.

430. McCleery responded that it was an inadvertent mistake.

431. Matt crossed out the primary residence line and checked investment property on the form

and then submitted it on March 21, 2007.

432. The first financial institution the Rippertons worked with on the IRRC was New Century Bank.

433. Matt had several conversations with Eric Moore of New Century about the project, and it became apparent that Moore did not know that the units were an investment property, nor that they would be sold on completion.

434. Matt raised this issue with McCleery, and she responded that the sale had nothing to do with the bank and that the bank did not need to know.

435. Matt was concerned, but MIP switched to alternate lenders and did not use New Century, so Matt no longer worried about the apparent lack of communication between MIP and New Century.

436. On July 10, 2007, Clarkson forwarded construction contracts and banking information to the Rippertons.

437. McCleery sent a separate email explaining that the contracts showed a down payment being made, but that the down payment would be made by MIP or WSS and that the Rippertons did not need to be concerned with the payment.

438. Matt responded to the construction contracts with several questions, specifically regarding the absence of any contingency sections in the contract regarding inspections and financing.

439. On July 11, 2007, Clarkson responded to Matt's questions, explaining that the contracts were contingent upon obtaining financing and that if for any reason financing was not approved,

the contracts would be cancelled.

440. Based on this information, Matt signed and returned the contracts to MIP for his assigned lots 42A and 42B the same day.

441. Matt also emailed McCleery to ask why the contract was only for two units when they had originally planned on investing in three units. McCleery responded the next day explaining that the bank would only do two units, or one full duplex, at a time.

442. On July 25, 2007, Matt sent corrected contracts to WSS. On the original contracts, the purchase price had been noted as $441,000.00, which were the loan amounts, instead of $490,000.00, the actual purchase price based on the 90 percent LTV.

443. On July 30, 2007, McCleery sent Matt an update on the project, explaining that the land improvements had been moving forward on all of the lots, that the roads were almost complete, and that foundations should start going in soon.

444. It was later discovered that this information was false as roads and other infrastructure are still not completed.

445. On August 6, 2007, Matt emailed McCleery regarding a conversation he had with a representative of Wells Fargo.

446. The representative from Wells Fargo informed Matt that Clarkson was setting up one of the loans as a second home and the other as an investment property.

447. Matt was concerned about this and wanted to make sure all of the information was being provided correctly as both lots were investment properties.

448. McCleery never responded to this email.

458. On August 29, 2007, Clarkson forwarded the HUD forms for closing.

459. The next day, McCleery sent a copy of the contract with MIP.

460. Matt signed the closing documents on August 31, 2007 at Charger Title with the assistance of Leslie Peterson but did not sign the contract with MIP at this time.

461. The Rippertons did not provide any money at the time of closing and were informed that none was required, according to the closing instructions provided by Wells Fargo.

462. This was in accordance with the representations previously made by McCleery, MIP, Drake, Snider, WSS/Tri Global, North Shore, and Clarkson.

463. According to the HUD Statement for lot 42A, a construction draw of $43,527.00 was made to WSS with an additional $130,090.00 being paid to North Shore. In essence, Drake and Snider received approximately $174,000.00, or 40 percent of the loan value at closing, when the lot showed no work completed and a lack of improvements.

464. According to the HUD Statement for lot 42B, a construction draw of $93,125.60 was made to WSS with an additional $130,090.00 being paid to North Shore. In essence, Drake and Snider received approximately $223,000.00, or 51 percent of the loan value at closing, when the lot showed no work completed and a lack of improvements.

465. At this same time, the Rippertons agreed with McCleery that MIP would return $3,000.00 of the deposit and pay the $10,000.00 partnership fee but would retain $3,000.00 to reserve a third unit, in which the Rippertons hoped to invest in the near future.

466. On September 4, 2007, McCleery emailed Matt informing him that she had invoiced the builder and that he should be receiving his payments in the near future.

467. At this same time, Matt returned permit applications to the builder so the project could move forward.

468. On September 12, 2007, Matt received instruction from WSS that any payment coupons from the bank needed to be sent to them so that WSS could make any required payments.

469. McCleery confirmed this information in an email sent the same day.

470. On October 4, 2007, MIP sent a check to the Rippertons for $7,000.00.

471. This check was to cover the $10,000.00 partnership agreement payment and the $3,000.00 reservation (investor) fee but had deducted $6,000.00 for an MIP investor education class.

472. The Rippertons were not pleased about being charged the $6,000.00 for the MIP class as the class never provided the services that had been promised. Essentially, the class amounted to propaganda as to why it is desirable for homeowners to tap into their home equity for investment purposes.

473. On October 5, 2007, Matt began sending information to Clarkson to qualify for financing on the third unit. However, the Rippertons' loan for an investment in a third unit never closed.

474. On October 23, 2007, Matt emailed WSS to inform them that one of the loan payments was past due.

475. WSS responded and said that the payment was in the process of being made.

476. On November 4, 2007, Clarkson and McCleery both sent requests to Matt that payment coupons from Wells Fargo be sent directly to WSS.

477. The Rippertons refused to do this because they wanted to be able to personally verify that

payments were being made on time. The Rippertons committed to forwarding the coupons on to WSS as soon as they received them from the bank.

478. On November 29, 2007, Matt discovered that he had not received a payment coupon from Wells Fargo and contacted the bank.

479. Matt was informed by the bank that the coupon had been sent directly to WSS and that WSS was making payments directly.

480. Matt was concerned about not being able to personally verify that payments were being made and requested that WSS send proof of payment directly to him.

481. On December 6, 2007, Matt emailed McCleery with questions on the contract with MIP. After receiving a response to his questions, Matt sent the signed contract to MIP on December 7, 2007.

482. On December 19, 2007, Matt sent notification to WSS that loan payments on lot 42A were three months in arrears.

483. It was later discovered that the payment coupons were sent by Wells Fargo to the construction site instead of the business office.

484. WSS responded that they would make the payments that day.

485. At the beginning of January 2008, Matt sent two separate emails to McCleery expressing his concerns with this and other MIP projects and the way MIP mortgage brokers working on MIP projects were dealing with the Lending Partners.

486. Matt's concerns went largely unaddressed.

487. On January 15, 2008, Clarkson sent draw requests to Matt for $42,715.00 per unit.

488. Matt was confused why the draw requests were being sent by his mortgage broker, but believing they needed to be signed to move the project forward, Matt signed and returned them.

489. It was later discovered that there were mistakes in the amounts requested on the draw forms. These were corrected by Karen Morris of WSS to add additional funds for completion of the garages attached to the units.

490. Matt signed the corrected forms on January 21, 2008 for $51,890.00 per unit.

491. On February 6, 2008, Matt received an email from Malcolm Smith (of Wells Fargo) inquiring about a discrepancy in the amounts requested (higher amounts had been written on the draw sheets after Matt had approved the $51,890.00 draw request).

492. Matt asked for an explanation from WSS.

493. WSS and McCleery both responded that Wells Fargo required that the numbers match the original cost breakdowns, and this is why the numbers were changed. Matt signed the modified draw sheets in the amount of $66,148.00 per unit and returned them believing it was necessary to move the project forward.

494. On April 3, 2008, the Rippertons began asking questions about getting the permanent financing in place, and McCleery sent an email explaining that the financing would only be necessary until the units sold and that closing costs and all mortgage payments would be made for the Rippertons.

495. On April 10, 2008, Matt signed additional draw requests for $62,862.00 per unit.

496. On April 28, 2008, Matt received an update from WSS with several pictures of the investment lot.

497. The pictures made it seem that stone and stucco were going up on his investment duplex.

498. At about this time, Matt was also informed of the switch from WSS to Tri Global and on May 2, 2008, Matt returned replacement contracts substituting Tri Global in place of WSS.

499. On May 2, 2008, Matt also signed draw forms for $20,277.00 per unit.

500. On May 30, 2008, Matt received an update from the builder on his investment lot with pictures that made it appear the exterior was complete on the duplex.

501. On June 2, 2008, Matt questioned discrepancies which were showing on the latest round of draw forms.

502. One form stated that the draws were for stone, and the other said the draws were for a concrete slab and lumber.

503. WSS/Tri Global responded that the units were no longer modular units, and the Wells Fargo branch dealing with lot 42A had not adjusted the amount for stick building.[2] WSS/Tri Global informed Matt that the bottom line would not change and that the true work completed was reflected in WSS/Tri Global's invoices.

504. On July 16, 2008, Matt sent an email to WSS/Tri Global asking about late payments and delays in construction.

505. WSS/Tri Global responded that it had not received statements; however, records indicate that the statements were sent to WSS/Tri Global's office in Denver.

506. Drake of WSS/Tri Global also responded that the delay in construction was a result of stick building the units and the units were much closer to completion than represented by Snider.

---

[2] "Stick building" is an industry term which means that the building is custom built on site and that pre-fabricated pieces are not used in construction.

507. Based on these representations, Matt returned draw forms for $10,151.00 per unit.

508. On August 15, 2008, Matt received an update from WSS/Tri Global with a picture of a kitchen fully installed (minus appliances) in one of the units.

509. On September 4, 2008, Matt received an email from McCleery explaining that an investor was interested in buying all of the IRRC units.

510. On September 9, 2008, Matt signed and returned draw forms for $15,214.00 per unit.

511. On September 10, 2008, Matt inquired about lien notices he had been receiving on the property and WSS/Tri Global responded that they were working on those issues.

512. To facilitate the purchase of the project from the outside investor, Matt requested payoff amounts from Wells Fargo.

513. On or about September 29, 2008, Wells Fargo informed Matt that the payoff amount for lot 42A was $323,191.00 and that lot 42B was approximately $387,355.00.

514. Also on September 29, 2008, WSS/Tri Global requested that signed draw forms be returned to obtain additional funds, but Matt did not send them in as WSS/Tri Global was behind on loan payments.

515. WSS/Tri Global also requested that Matt sign loan extension documents for lot 42B. In reality construction was not complete and Wells Fargo would not release additional funds without the extension.

516. On October 13, 2008, Matt contacted McCleery and asked what he should do with the recent draw requests. Matt faced a dilemma as WSS/Tri Global was demanding additional draws, but the investor seeking to buy the project had informed Matt not to make any additional draws

unless a mechanism to control the funds was put in place and run through a title company.

517. Matt was in a winless position as the loan extension agreement would reduce the amount of the loan from $441,000.00 to $391,000.00, and $387,000.00 had already been drawn.

518. Matt also was in a position where he had to extend the loan, or Wells Fargo would call the entire amount due. However, if Matt extended, this would trigger the release of funds and would violate the potential buyer's instructions to run any additional expenditures through a title company.

519. Based on McCleery's instructions, Matt returned the extension agreement to Wells Fargo, which reduced the loan amount available from $441,000.00 to $391,000.00 and also extended the term to January 23, 2009.

520. Ultimately, Matt signed the extension documents to keep the note from being called due. At the time of the extension, Wells Fargo was fully aware that even if construction of the duplex was completed the units would be worthless as no utilities ran to the properties.

521. Wells Fargo intentionally did not inform Matt of this as Drake and Snider were current on interest payments and had agreed to continue to make the interest payments.

522. On October 16, 2008, Matt received explicit instructions from McCleery not to sign any more draws until fund control was set up through a title company.

523. On October 17, 2008, Matt received a letter from Drake and Snider of WSS/Tri Global stating that all interest payments through October were current and that all funds requests were endorsed by a title company after Wells Fargo's inspections.

524. The potential buyer continued negotiations for purchase of the IRRC, but nothing

finalized, and the buyer eventually completely backed away from the Indian Ridge Resort.

525. On December 1, 2008, Matt received a letter from Wells Fargo informing him that the loan on lot 42B was in default and needed to be cured by January 1, 2009.

526. On December 31, 2008, Matt received another letter from Wells Fargo saying that the loan on lot 42A was in default and that they would accelerate the loan if the amount due was not paid by January 30, 2009.

527. On January 13, 2009, Matt received notice of default on the lot 42A loan.

528. On January 21, 2009, Matt received a letter from Wells Fargo stating that he needed to make full payment on the loan for lot 42B or collection and foreclosure proceedings would be initiated.

529. On January 27, 2009, Matt received a letter from WSS/Tri Global giving reasons for the delay in construction.

530. To date, Matt owes obligations to Wells Fargo in excess of $715,000.00 and have nothing to show for it because the two unfinished lots in Branson West, Missouri have been foreclosed on through judicial proceedings (see footnote 1 on page 15 of this Complaint).

**Facts Particular to the Hadlocks**

531. The Hadlocks first learned of MIP while attending meetings put on by the Utah Creative Real Estate Association in early 2006.

532. The Hadlocks engaged in multiple conversations and emails with McCleery about the different opportunities being presented by MIP.

533. The Hadlocks' investment objective was to avoid risk. As a result, they were willing to

accept lower returns due to a lower risk tolerance.

534. Based on this information, McCleery recommended that they select the credit partner option provided by MIP.

535. McCleery explained that they would not be required to put any money in and would receive $5,000.00 per unit they financed with MIP.

536. The Hadlocks received an email and printout from MIP and McCleery, completely outlining the credit partner arrangement on March 30, 2006.

537. The Hadlocks learned of the IRRC in or about July 2006.

538. The Hadlocks still had skepticism about the project and did not initially become involved.

539. The Hadlocks continued to attend MIP meetings and were informed at a meeting held on February 28, 2007 that additional investment openings were available in the IRRC.

540. At this meeting, MIP and McCleery pushed the IRRC as an extremely safe investment. The Hadlocks asked in this meeting, and on several other occasions, what their risks were. They were repeatedly told that the only real risk was if McCleery and MIP employee David Burton were to die at the same time but that even if that happened, the Hadlocks would still have a valuable piece of property.

541. The Hadlocks fully believed that they were only at risk of losing their $3,000.00 reservation if they changed their mind after committing to finance a unit.

542. Based on these representations, the Hadlocks decided to move on the IRRC investment. On March 6 and 7, 2007, they sent emails to McCleery expressing their interest and also verifying their payment of a $3,000.00 reservation (investor) fee.

543. On March 8, 2007, the Hadlocks received an email from McCleery asking them to fill out the attached 1003 real estate (investor) documents, sign them, and return for MIP's records.

544. The Hadlocks began receiving the same emails made reference to in the above sections regarding financing from McCleery and Clarkson.

545. McCleery and Clarkson both informed the Hadlocks that Clarkson would be dealing directly with the Lending Partners and other financial institutions.

546. On April 30, 2007, the Hadlocks received an email from McCleery stating that paperwork would be sent the next day to close on the IRRC property and that the Hadlocks needed to sign the RESPA documents. This closing never went through as promised.

547. On July 30, 2007, the Hadlocks received an email from MIP stating that financing for four more IRRC lots had closed with Wells Fargo, that land improvements were moving forward on all lots as if they had all closed, that the roads were almost complete, and that foundations would start going in soon.

548. This email led the Hadlocks to believe that the project was moving forward and that the delays they were experiencing with their closing would not affect the project at all. Based on this information, the Hadlocks continued working with Clarkson to secure financing on the project.

549. The Hadlocks provided all requested information to Clarkson and, after going through several financial institutions, finally obtained assurances that Lawrence Bank would provide financing for the deal.

550. Several of the forms sent to the Hadlocks by Clarkson contained incorrect information specifically that the unit was to be owner-occupied.

551. The Hadlocks corrected this on every application they received and repeatedly informed Clarkson that the property was strictly an investment property and would not be owner occupied.

552. The Hadlocks attempted to stay in constant communication with McCleery during this process and sent her several emails with questions regarding the project.

553. On August 30, 2007, the Hadlocks received an email from McCleery responding to questions the Hadlocks had posed regarding the risk on the project and specifically with payments made on the financing.

554. In this email, McCleery explained that the monthly payments on the financing came directly from MIP but that the cash was secured by the property. McCleery went on to explain that there was little risk of losing the principal. She explained that if the company (MIP) did go down, or if she died, the monthly payments could stop, but there was no need to worry because MIP had six months reserve payments for each property.

555. On September 10, 2007, the Hadlocks received an email from MIP showing progress on the development of the project and stated that the roads were taking shape and foundations would be going in soon.

556. On October 4, 2007, the Hadlocks received an email from McCleery which she had forwarded on from Clarkson. The email explained that the construction loan would be financed by Lawrence Bank and permanent financing would be set up through Wells Fargo. The email also contained a list of the items Clarkson would need to provide to Lawrence Bank.

557. On October 10, 2007, the Hadlocks received a credit authorization form for Lawrence Bank which needed to be signed and returned to Clarkson.

558. On October 12, 2007, the Hadlocks received an email from McCleery with a blank financial statement attached. McCleery requested the Hadlocks fill out the financial statement and return it to Clarkson for Lawrence Bank.

559. On November 9, 2007, the Hadlocks received an email from Clarkson explaining that the closing should happen by Thanksgiving.

560. On December 5, 2007, the Hadlocks closed on the loan with Lawrence Bank for lot 11A. The Hadlocks did not select lot 11A. Instead, this lot was assigned to them.

561. The closing was accomplished with Kip Hurley through Great Lakes.

562. The Hadlocks verified that they would not be required to provide any money at closing and that MIP or WSS would cover all payments due on the loan.

563. Hurley assured them that no money was required at closing and McCleery assured them that per the terms of the agreement MIP or WSS would pay all costs associated with the loans.

564. In fact, there was no requirement that any checks or money be exchanged at closing.

565. The HUD statement notes a down payment at closing of $94,630.00 being made to WSS and incorporated as a payment made by *or on behalf of* the borrower.

566. Further, the promissory note contained the following language under representations and warranties regarding utility services:

> Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of the loan, and at all times any indebtedness exists:...all utility services appropriate to the use of the project after completion of construction are available at the boundaries of the Collateral.

567. The Hadlocks fully believed that this representation was correct, based on the

information they had received. Lawrence Bank, on the other hand, knew this statement was false

based on the appraisal and its own inspection conducted by Clark, but purposely included the

language in the promissory note.

568. It was indicated to the Hadlocks that the $94,630.00 construction draw would be used for

permits, surveys, water/gas/sewer, 20 percent modular unit, and excavation. This draw request

was dated December 4, 2007.

569. On information and belief, Lawrence Bank disbursed the $94,630.00 to WSS, Drake, and

Snider in accordance with the draw request even though the funds were purportedly received at

or around closing.

570. At the time of the closing, Lawrence Bank knew that North Shore was the owner of the

other half of the Hadlocks' duplex.

571. Lawrence Bank knew that no structure would be built until after another investor was

found. Nonetheless, Lawrence Bank permitted the closing to take place and the funds to be

disbursed because it was guaranteed its interest payment and closing fees from Drake and Snider.

572. Shortly thereafter, on or about December 19, 2007, the Hadlocks received a check for

$6,500.00 which covered the $5,000.00 payment and a refund of their $1,500.00 reservation fee[3].

573. Approximately one week after closing, Althea received a phone call from Clarkson.

574. During the phone conversation, Clarkson asked Althea to fax him a check for $98,000.00.

575. Clarkson explained that the check would not be cashed, but that Lawrence Bank had

changed its requirements on the loan and the check had become necessary.

---

[3] MIP typically charged a reservation (investor) fee of $3,000.00 per unit; however, by agreement, the Hadlocks were only required to pay a reservation fee of $1,500.00.

576. Althea was confused as to how the terms could change after the loan had already closed, but Clarkson told her that if she did not send him the check that she would immediately be responsible for all the costs of the loan, which were approximately $17,000.00.

577. Althea said that she thought it was dishonest to change the terms of the agreement, and Clarkson said that it was, but it was her only choice.

578. Clarkson told Althea that she needed to send the check immediately and back date it to December 3, 2007.

579. Althea was so distraught over the information Clarkson was giving her that she did not realize that back dating the check to December 3, 2007, placed the date of the check before closing.

580. Althea felt that she had no choice but to send the check and trust that Clarkson was looking out for her best interests.

581. On information and belief, this check was used to show that a down payment had been made by Althea for the loan.

582. The Hadlocks continued to receive the same updates noted *supra* regarding the progress on the IRRC.

583. In October 2008, the Hadlocks received notice from Lawrence Bank that the interest payments due on the loan were not being paid.

584. To protect their credit, the Hadlocks began making the interest payments and, to date, have paid over $20,000.00 in interest and principal, which, pursuant to the agreement with MIP, were required to be made by MIP.

585. The Hadlocks also were forced to pay property taxes, which, per the terms of the contract, were to be paid by MIP.

586. McCleery had further informed the Hadlocks in an email dated January 28, 2008, that the interest payments and property taxes would be paid by WSS/Tri Global.

587. The Hadlocks contacted Lawrence Bank and requested information as to what they should do to rectify the problems that were occurring with the loan.

588. Lawrence Bank requested that the Hadlocks obtain a break down on what work had been performed on the property and an itemized list of how the disbursements had been used.

589. The Hadlocks immediately made this request to Drake at WSS/Tri Global, and Drake assured them that he would provide this information to them and forward the information on to Clark at Lawrence Bank.

590. After the Hadlocks made repeated attempts to obtain the information from Drake without success, Drake informed the Hadlocks they would have to get the information from his attorney, Mr. Charles Liken.

591. The Hadlocks contacted Mr. Liken and made these requests as well.

592. Liken informed them that Drake was in the process of providing this information and they would have it in the near future.

593. The dates that Drake had promised to provide the information passed without any results.

594. The Hadlocks contacted Liken asking for the information, and Liken expressed his frustration with the fact that Drake still had not provided the information to him.

595. Shortly thereafter, Drake ceased accepting phone calls from the Hadlocks and refused to

return any of their messages.

596. It was later discovered that much of the construction work which had been represented by MIP, WSS/Tri Global, Drake, and Snider to have been completed had not been and the construction distributions that had been issued by Lawrence Bank had not gone towards the construction of the project as represented.

597. Any work performed on Lot 11A is not equivalent to the amounts drawn on the Hadlocks construction loan.

598. Lawrence Bank conducted inspections of the Hadlocks' property, revealing the amount of work completed each month.

599. The inspection report dated January 22, 2008 indicated that half of the "clear lot and rough grade" had been completed with 1 percent of the overall project complete.

600. The inspection report dated February 25, 2008 indicated that an additional fourth of the "clear lot and rough grade" had been completed with 1.5 percent of the overall project complete.

601. The inspection report dated March 21, 2008 indicated that no additional work had been completed on the lot.

602. The inspection report dated April 23, 2008 indicated that no additional work had been completed on the lot.

603. The inspection report dated May 20, 2008 indicated that no additional work had been completed on the lot.

604. The inspection report dated June 19, 2008 indicated that no additional work had been completed on the lot.

605. The inspection report dated July 17, 2008 indicated that no additional work had been completed on the lot.

606. The final inspection completed by Lawrence Bank dated September 19, 2008 indicated that no additional work had been completed on the lot. This report indicated that a total of 1.5 percent of the overall project was completed.

607. At this point in time, approximately $230,000.00 had been drawn from the loan or 59 percent of the entire loan. This does not account for the additional deposit of $98,000.00 purportedly received by WSS/Tri Global, Drake, and Snider for the project. With this additional funding, Drake and Snider had received approximately 84 percent of the value of the property for completing only 1.5 percent of the construction.

608. On information and belief, it is believed that the money was used to make the interest payments on the bank loans (as interest payments stopped being made the instant construction distributions stopped) and that the majority of the monies not used for interest payments were pocketed by MIP, McCleery, Clarkson, WSS/Tri Global, North Shore, Drake, and Snider.

609. To date, the Hadlocks owe $231,075.48 on their loan and have nothing to show for it because the two unfinished lots in Branson West, Missouri have been foreclosed on through judicial proceedings (see footnote 1 on page 15 of this Complaint).

### Facts Particular to Tim and Marianne Brent

610. The Brents learned about the IRRC investment opportunity through McCleery.

611. The Brents had done previous investments with MIP, so McCleery contacted the Brents and solicited their investment for the IRRC.

612. The Brents also spoke with Clarkson before becoming involved in the IRRC.

613. The Brents entered into the credit partnership (investor) agreement with MIP in 2007.

614. Per the terms of the agreement, the Brents were required to proceed with loan applications using their social security numbers and credit.

615. The agreement also required the Brents to fill out the necessary applications, provide required documents, attend the closing, and take all necessary steps to secure the mortgage.

616. The agreement required MIP to pay the Brents $5,000.00 per duplex financed and to make all payments on the mortgage note.

617. The Brents agreed to allow the Defendants to use their credit to fund one unit.

618. After entering into the agreement with MIP, the Brents began the process of working with MIP and Clarkson to secure the financing for the project.

619. The Brents began exchanging several emails with McCleery and Clarkson to gather the necessary information to prequalify for the required financing.

620. The Brents provided all of the required information which consisted of the typical documents needed for loan approval: tax returns, pay stubs, bank statements, etc.

621. During this same time period, the Brents received updates from McCleery on the status of the IRRC as well as plat maps and other information needed to secure the loans.

622. In the loan qualification process with Lawrence Bank, the Brents were assigned lot 15A.

623. The Brents submitted their loan application to Clarkson. In turn, Clarkson submitted this application to Clark at Lawrence Bank.

624. Upon information and belief, either Clarkson or Clark changed the Brents' stated income

and net worth.

625. The Brents accurately reported their income and net worth to Clarkson and believed Clarkson had reported the correct figures to Lawrence Bank.

626. The closing on the loan took place on November 20, 2007.

627. At the closing, the Brents were not given a meaningful opportunity to review the underlying loan application.

628. The HUD statement notes a down payment at closing of $94,630.00 being made to WSS as a payment made by *or on behalf of* the borrower.

629. Further, the promissory note contained the following language under representations and warranties regarding utility services:

> Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of the loan, and at all times any indebtedness exists:...all utility services appropriate to the use of the project after completion of construction are available at the boundaries of the Collateral.

630. The Brents fully believed that this representation was correct, based on the information they had received. Lawrence Bank, on the other hand, knew this statement was false based on the appraisal and its own inspection conducted by Clark, but purposely included the language in the promissory note.

631. It was indicated to the Brents that the $94,630.00 construction draw would be used for permits, survey, water/gas/sewer, 20 percent modular unit, and excavation. This draw request was dated November 20, 2007.

632. On information and belief, Lawrence Bank disbursed the $94,630.00 to WSS, Drake, and

Snider in accordance with the draw request, even though the funds were purportedly received at or around closing.

633. At the time of the closing, Lawrence Bank knew that North Shore was the owner of the other half of the Brents' duplex.

634. Lawrence Bank knew that no structure would be built until after another investor was found. Nonetheless, Lawrence Bank permitted the closing to take place and the funds to be disbursed because it was guaranteed its interest payment and closing fees from Drake and Snider.

635. The Brents regularly received updates on the IRRC through emails and newsletters from MIP, McCleery, WSS/Tri Global, Drake, and Snider that assured all investors that construction was progressing rapidly.

636. Drake and Snider took these opportunities to pitch other projects WSS/Tri Global was beginning.

637. The Brents signed a New Construction Agreement with WSS/Tri Global in June of 2008.

638. WSS/Tri Global, North Shore, Drake, Snider, MIP, McCleery, and Clarkson assured the Brents that all interest payments on the loan would be covered by the builder, WSS/Tri Global, Drake, and Snider.

639. It was later discovered that much of the construction work which had been represented by MIP and WSS/Tri Global to have been completed had not been, and the construction distributions which had been issued by Lawrence Bank had not gone towards the construction of the project as represented.

640. Any work performed on Lot 15A is not equivalent to the amounts drawn on the Brents'

construction loan.

641. Lawrence Bank conducted inspections of the Brents' property, revealing the amount of work completed each month.

642. The inspection report dated January 22, 2008 indicated that half of the "clear lot and rough grade" had been completed with 1 percent of the overall project complete.

643. The inspection report dated February 15, 2008 indicated that no additional work had been completed on the lot.

644. The inspection report dated March 21, 2008 indicated that an additional fourth of the "clear lot and rough grade" had been completed with 1.5 percent of the overall project complete.

645. The inspection report dated April 23, 2008 indicated that no additional work had been completed on the lot.

646. The inspection report dated May 20, 2008 indicated that no additional work had been completed on the lot.

647. The inspection report dated June 19, 2008 indicated that no additional work had been completed on the lot.

648. The inspection report dated July 17, 2008 indicated that no additional work had been completed on the lot.

649. The inspection report dated August 18, 2008 indicated that no additional work had been completed on the lot.

650. The final inspection report conducted by Lawrence Bank dated September 19, 2008 indicated that no additional work had been completed, meaning that only 1.5 percent of the

overall project had been completed during the nine-month period.

651. At this time, approximately $225,000.00 had been drawn from the loan, or 50 percent of the entire loan. WSS/Tri Global, North Shore, Drake and Snider received at least half of the value of the property for completing only 1.5 percent of the construction.

652. On information and belief, it is believed that the money was used to make the interest payments on the bank loans (as interest payments stopped being made the instant construction distributions stopped) and that the majority of the monies not used for interest payments were pocketed by MIP, McCleery, Clarkson, WSS/Tri Global, North Shore, Drake, and Snider.

653. The Brents were forced to make interest payments to keep their loan from going into default.

654. To remedy the situation that had been created by MIP, WSS/Tri Global, North Shore, Drake, and Snider's failure to make the interest payments as promised and finish the project, the Brents began negotiating with a possible third party to purchase the project.

655. Nothing resulted from these negotiations, and the Brents were left with a loan of approximately $230,000.00 and have nothing to show for it because the two unfinished lots in Branson West, Missouri have been foreclosed on through judicial proceedings (see footnote 1 on page 15 of this Complaint).

### Facts Particular to John Brent

656. John became aware of the IRRC investment opportunity through a conference call with Tim Brent and McCleery.

657. Prior to this time, John had not had any contact with McCleery, MIP, or Clarkson.

658. John entered into the credit partnership (investor) agreement with MIP in 2007.

659. Per the terms of the agreement, John was required to proceed with loan applications using his social security number and credit.

660. The agreement also required John to fill out the necessary applications, provide required documents, attend the closing, and take all necessary steps to secure the mortgage.

661. The agreement required MIP to pay John $5,000.00 per duplex financed and to make all payments on the mortgage note.

662. John agreed to allow the Defendants to use his credit to fund two duplexes.

663. After entering into the agreement with MIP, John began the process of working with MIP and Clarkson to secure the financing for the project.

664. John began exchanging several emails with McCleery and Clarkson to gather the necessary information to prequalify for the required financing.

665. John provided all of the required information, which consisted of the typical documents needed for loan approval: tax returns, pay stubs, bank statements, etc.

666. During this same time period, John received updates from McCleery on the status of the IRRC as well as plat maps and other information needed to secure the loans.

667. In the process of loan qualification with Lawrence Bank and Wachovia, John was assigned lots 18A and 18B.

668. John submitted an initial loan application to Brent Clarkson. In turn, Clarkson submitted this application to John Doe loan agent(s) acting on behalf of Wachovia.

669. Wachovia forwarded John's application to Clark acting on behalf of Lawrence Bank.

670. Lawrence Bank denied John's application.

671. Clarkson spoke with Clark and was advised to resubmit John's application after revising John's stated income figures.

672. Either Clarkson or Clark changed John's stated income and net worth.

673. John accurately reported his income and net worth to Clarkson and believed Clarkson had reported the correct figures to Lawrence Bank.

674. On or about December 2007, John received notice that his construction loan with Lawrence Bank had been approved.

675. The closing on the loan with Lawrence Bank took place on January 10, 2008.

676. At the closing, John was not given a meaningful opportunity to review the underlying loan application.

677. The HUD statement notes a $98,000.00 payment *by or on behalf of* the borrower, along with a $94,630.00 construction draw provided to Drake and Snider.

678. It was indicated to John that the $94,630.00 construction draw would cover the survey, permits, water/gas/sewer, 20 percent modular unit, and excavation. A later draw request dated March 31, 2008 requests funding for engineering, permits, water taps, excavation, footings, and slab. This draw request appears to be permission for funds to be released at closing, although the closing took place 2.5 months prior.

679. Unbeknownst to John, by signing the addendum, these funds were released to Drake and Snider, although they had already received a disbursement at the time of closing.

680. Further, the promissory note contained the following language under representations and

warranties regarding utility services:

> Borrower represents and warrants to Lender, as of the date of this Agreement, as of
> the date of each disbursement of loan proceeds, as of the date of any renewal,
> extension or modification of the loan, and at all times any indebtedness exists:…all
> utility services appropriate to the use of the project after completion of construction
> are available at the boundaries of the Collateral.

681. John fully believed that this representation was correct, based on information he received.

Lawrence Bank, on the other hand, knew this statement was false, based on the appraisal and its

own inspection conducted by Clark, but purposely included the language in the promissory note.

682. Also in January 2008, John signed New Construction Agreements with WSS/Tri Global.

683. John closed on his loan with Wachovia on May 30, 2008.

684. This HUD statement indicates that a deposit or earnest money of $500 along with a

construction draw of $72,500.00 was paid by/for borrower. In reality, these amounts were paid

for by a third party or Drake and Snider as previously agreed with the bank.

685. Drake and Snider regularly provided "updates" to the investors on the IRRC and pitched

to them other projects WSS/Tri Global was beginning.

686. WSS/Tri Global, North Shore, Drake, and Snider repeatedly assured investors through

emails and newsletters that construction was progressing rapidly.

687. On June 16, 2008, John executed a Change in Terms Agreement with Lawrence Bank to

extend the maturity date of his loan.

688. At this time, Lawrence Bank was fully aware that little to no work had been completed

on John's lot but failed to inform him of this fact. On information and belief, Lawrence Bank

was unconcerned with the lack of work that had been completed on the lot because Drake and

Snider were current in making interest payments on the loan and had promised to continue making the payments.

689. On August 18, 2008, John signed a draw request from Tri Global in the amount of $60,077.00, which he promptly returned, believing it was necessary to keep the project moving and that the money was being used for construction on his investment lot.

690. Clark of Lawrence Bank authorized this disbursement on August 25, 2008.

691. Lawrence Bank disbursed the $60,077.00 to Tri Global, bringing the total disbursed on John's loan, to this point, at roughly $289,857.00, equal to approximately 74% of the total construction loan. Lawrence Bank disbursed this money despite the August 18, 2008 inspection report showing only 2.5% completion of John's investment property, and only .5% of any work being done since May 2008.

692. WSS/Tri Global, North Shore, Drake, Snider, MIP, McCleery, and Clarkson assured John that all interest payments on the loan would be covered by the builder, WSS/Tri Global, Drake and Snider.

693. It was later discovered that much of the construction work that had been represented by MIP and WSS/Tri Global to have been completed had not been, and the construction distributions which had been issued by Lawrence Bank and Wachovia had not gone towards the construction of the project as represented.

694. Any work performed on Lot 18A and Lot 18B is not equivalent to the amounts drawn on John's construction loans.

695. Lawrence Bank conducted inspections of John's property, revealing the amount of work

completed each month.

696. The inspection report dated February 15, 2008 indicated that half of the "clear lot and rough grade" had been completed with 1 percent of the overall project complete.

697. The inspection report dated March 21, 2008 indicated that an additional fourth of the "clear lot and rough grade" had been completed with 1.5 percent of the overall project complete.

698. The inspection report dated April 23, 2008 indicated that no additional work had been completed on the lot.

699. The inspection report dated May 20, 2008 indicated that the "clear lot and rough grade" had been completed with 2 percent of the overall project complete.

700. The inspection report dated June 19, 2008 indicated that no additional work had been completed on the lot.

701. The inspection report dated July 17, 2008 indicated that no additional work had been completed on the lot.

702. The inspection report dated August 18, 2008 indicated that an eighth of the footings had been completed with 2.5 percent of the overall project complete.

703. The final inspection report conducted by Lawrence Bank dated September 19, 2008 indicated that the footings, foundation walls and piers, floor frame (joists) or slab, and subfloor were complete, along with a third of the outside studs and top plates (including sheathing) and a twelfth of the inside studs and ceiling joints. This report indicated that a total of 20.25 percent of the overall project was completed.

704. At this point in time, approximately $250,000 had been drawn from the loan, or 63

percent of the entire loan. This does not account for the additional deposit of $98,000 purportedly received by WSS/Tri Global, Drake and Snider for the project. With this additional funding, Drake and Snider had received approximately 71 percent of the value of the property for completing only 20 percent of the construction.

705. On information and belief, it is believed that the money was used to make the interest payments on the bank loans (as interest payments stopped being made the instant construction distributions stopped), and that the majority of the monies not used for interest payments were pocketed by MIP, McCleery, Clarkson, WSS/Tri Global, North Shore, Drake, and Snider.

706. John was forced to make interest payments to keep his loans from going into default.

707. John received demand from Lawrence Bank for payment of the outstanding loan balance equaling $290,000 for Lot 18A.

708. To remedy the situation that had been created by MIP, WSS/Tri Global, North Shore, Drake, and Snider's failure to make the interest payments as promised and finish the project, John began negotiating with a possible third party to purchase the project.

709. Nothing resulted from these negotiations, and John was left with loans of more than $400,000.00 and has nothing to show for it because the two unfinished lots in Branson West, Missouri have been foreclosed on through judicial proceedings (see footnote 1 on page 15 of this Complaint).

## THEORIES OF LIABILITY

### Civil Conspiracy

710. The Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this

Complaint as though fully set forth herein.

711. The Defendants, (1) consisting of two or more individuals or entities; (2) with the objective of inducing the Plaintiffs to enter into investment transactions through financing the IRRC; (3) with a meeting of the minds on the intended investment transactions and financing scheme of the IRRC; (4) in which occurred one or more unlawful overt acts, including but not limited to violations of the Racketeer Influenced and Corrupt Organizations Act, fraud, negligence, and conversion; and (5) which actions are the proximate cause of damages to the Plaintiffs through losses of their investment monies or loans, were involved in a civil conspiracy.

712. As outlined *supra*, all of the Defendants had a complete understanding of their role in the investment scheme being promoted to the Plaintiffs. Each Defendant voluntarily participated in the investment scheme and acted in concert with the other Defendants in offering, selling, furthering, and/or promoting the investment to the Plaintiffs. Each Defendant knowingly participated in fraudulent misrepresentations and omissions with the intent to induce the Plaintiffs to invest in the IRRC.

713. As a result of the foregoing, the Defendants have formed and engaged in a civil conspiracy.

714. As a direct result of the Defendants' civil conspiracy, the Plaintiffs have been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal investments, missed payments, interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending Partners for late or missed payments, the total amount due to the Lending Partners to close out the financing, and a compensatory amount for the damage done

to the Plaintiffs' credit caused by the Defendants' civil conspiracy, and reasonable attorney fees and costs associated with this action.

## Joint Venture

715. The Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this Complaint as though fully set forth herein.

716. A joint venture is formed when an express or implied agreement exists among the members of a group; a common purpose is carried out by the group; a community of pecuniary interests exists among the members in that interest; and an equal right to voice direction in the enterprise exists, which gives an equal right of control among the members.

717. On information and belief, Drake, Snider, WSS/Tri Global, North Shore, and the Lending Partners entered into express or implied agreements regarding the funding of the investments being offered, sold, and promoted to the Plaintiffs and other investors.

718. On information and belief, Drake, Snider, WSS/Tri Global, North Shore, MIP, McCleery, and Clarkson entered into express or implied agreements regarding the promotion of the investments being offered, sold, and promoted to the Plaintiffs and other investors.

719. On information and belief, Drake, Snider, WSS/Tri Global, North Shore, Shirato, and the Shirato Indian Ridge Business Entities entered into express or implied agreements regarding the development of the properties being offered, sold, and promoted as investments to the Plaintiffs and other investors.

720. On information and belief, a common purpose of offering, selling, furthering, and promoting investments in the IRRC through the financing scheme described *supra* was agreed to

and carried out by the Defendants.

721. On information and belief, each of the Defendants expected to and did receive large amounts of money from the offering, selling, furthering, and promoting the investment in the IRRC through the financing scheme offered by the Defendants to the Plaintiffs.

722. On information and belief, an equal right to voice direction in the enterprise existed, giving an equal right of control among the Defendants concerning the offering, selling, furthering, and promoting investments in the IRRC through the financing scheme offered by the Defendants to the Plaintiffs.

723. On information and belief, each of the Defendants was able to control the direction of the IRRC by way of retaining or disbursing funds and determining which information to provide to the Plaintiffs.

724. By reason of the foregoing, the Defendants formed a joint venture concerning the offering, selling, furthering, and promoting investments in the IRRC through the financing scheme offered by the Defendants to the Plaintiffs. As such, each of the Defendants, as members of the joint venture, is jointly and severally liable for the unlawful acts of any other joint venture member, even if those acts were unknown but still in concert with the purpose of the joint venture.

725. As a direct result of the Defendants' joint venture, the Plaintiffs have been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal investments, missed payments, interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending Partners for late payments, the total amount due to the Lending

Partners to close out the financing, and a compensatory amount for the damage done to the Plaintiffs' credit due to the Defendants' joint venture, with reasonable attorney fees and costs associated with this action.

## COUNT I – BREACH OF FIDUCIARY DUTY

726. The Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this Complaint as though fully set forth herein.

727. The Defendants, individually and collectively, stood in a fiduciary capacity, possessing superior knowledge concerning the design, planning, loan qualification, financing, viability, progress, and supposed construction of the IRRC relative to the Plaintiffs' involvement as investors. Each knew or had reason to know the Plaintiffs' stood in an inferior position as to knowledge and relied upon the expertise and knowledge of each Defendant as to their investment(s) in the IRRC.

728. As such, the Defendants owed a fiduciary duty to the Plaintiffs to exercise informed, reasonable, and prudent care concerning the Plaintiffs' investment principal, loan qualification, disbursement, and application constituting their investment in the IRRC.

729. As outlined in the facts herein, the Defendants' actions concerning the Plaintiffs' involvement as investors by financing of the IRRC was uninformed, unreasonable, reckless, and negligent.

730. As outlined by the facts herein, the Defendants have breached the fiduciary duty owed to the Plaintiffs.

731. As a direct result of the Defendants' breach of fiduciary duty, the Plaintiffs have been

damaged in an amount to be proven at trial but not less than an amount that includes the

Plaintiffs' principal investments, loan principal, missed payments, interest payments and

property taxes paid by the Plaintiffs, penalties assessed by the Lending Partners for late

payments, the total amount due to the Lending Partners to close out the financing, and a

compensatory amount for the damage done to the Plaintiffs' credit due to the Defendants' breach

of fiduciary duty, with reasonable attorney fees and costs associated with this action.

### COUNT II – NEGLIGENCE

732. The Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this

Complaint as though fully set forth herein.

733. The Defendants owed the Plaintiffs a duty of care concerning their investments and

financing the IRRC as investors.

734. As described above, the Defendants failed to exercise the requisite duty of care owed the

Plaintiffs.

735. As described above, the Defendants' failure to exercise care proximately and actually

caused the Plaintiffs damages.

736. As a result of the foregoing, the Defendants have committed negligence.

737. As a direct result of the Defendants' negligence, the Plaintiffs have been damaged in an

amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal

investments, loan principal, missed payments, interest payments and property taxes paid by the

Plaintiffs, penalties assessed by the Lending Partners for late payments, the total amount due to

the Lending Partners to close out the financing, and a compensatory amount for the damage done

to the Plaintiffs' credit due to the Defendants' negligence, with reasonable attorney fees and costs associated with this action.

## COUNT III – BREACH OF CONTRACT
### (MIP-WSS/Tri Global)

738. The Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this Complaint as though fully set forth herein.

739. The Plaintiffs entered into a valid and enforceable contract with WSS/Tri Global through MIP, whereby the Plaintiffs allowed WSS/Tri Global to use their credit to finance lots in the IRRC.

740. As part of the agreement, the Plaintiffs were required to apply their best efforts to receive financing on the IRRC through Lending Partners or other financial institutions.

741. The Plaintiffs conformed to the requests placed upon them and did in fact secure financing for the project.

742. As part of the agreement, WSS/Tri Global, through MIP, was required to pay $5,000.00 per unit financed and also to make all payments on the obtained financing.

743. WSS/Tri Global, through MIP, has breached the terms of the contract by failing to make the mandatory payments on the financing.

744. As a direct result of this breach of contract, the Plaintiffs have been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal investments, loan principal, missed payments, interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending Partners for late payments, the total amount due to

the Lending Partners to close out the financing, and a compensatory amount for the damage done

to the Plaintiffs' credit due to MIP's breach, with reasonable attorney fees and costs associated

with this action.

### (WSS/Tri Global)

745. The Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this

Complaint as though fully set forth herein.

746. The Plaintiffs entered into valid and enforceable contracts with WSS for the construction

of duplexes in the IRRC.

747. The duties and obligations contained in the contracts between the Plaintiffs and WSS

were transferred to Tri Global.

748. The Plaintiffs have conformed to all duties and requirements placed upon them by the

contract with WSS/Tri Global.

749. WSS/Tri Global has breached the terms of the agreement by failing to construct the

duplex units as promised in the contract.

750. WSS/Tri Global made and accepted disbursement requests far in excess of any work

performed on the property.

751. Further, WSS/Tri Global made disbursement requests for parts of the modular units that

were to be provided by Vickie Drake, never intending to use modular units.

752. On information and belief, these funds were provided to Vickie Drake as a means of

funneling additional funds directly to Drake and Snider.

753. As a direct result of WSS/Tri Global's breach of contract, the Plaintiffs have been

damaged in an amount to be proven at trial but not less than an amount that includes the

Plaintiffs' principal investments, loan principal, missed payments, interest payments and

property taxes paid by the Plaintiffs, penalties assessed by the Lending Partners for late

payments, the total amount due to the Lending Partners to close out the financing, and a

compensatory amount for the damage done to the Plaintiffs' credit due to WSS/Tri Global's

breach, with reasonable attorney fees and costs associated with this action.

## COUNT IV – BREACH OF THE COVENANT
## OF GOOD FAITH AND FAIR DEALING

754. The Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this

Complaint as though fully set forth herein.

755. Pursuant to Utah law, each and every contract entered into in the state of Utah carries

with it an implied covenant of good faith and fair dealing.

756. The implied covenant of good faith and fair dealing imposes a burden upon the

contracting parties to act in such a way as to insure the other parties receive the fruits of the

contract.

### (MIP)

757. Defendant MIP failed to act in good faith and in a fair manner by refusing to make the

payments on the loan obligations incurred by the Plaintiffs.

758. Defendant MIP also failed to act in good faith and in a fair manner by ensuring a virtual

risk-free investment and failing to mitigate the damage done to the Plaintiffs and/or intervening

to protect Plaintiffs as a simple credit partner when the IRRC project failed.

759. Defendant MIP's actions have resulted in the Plaintiffs being deprived of the fruits of the contract and have also caused great detriment to the Plaintiffs.

760. As a result of this breach of the implied covenant of good faith and fair dealing, the Plaintiffs have been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal investments, loan principal, missed payments, interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending Partners for late payments, the total amount due to the Lending Partners to close out the financing, and a compensatory amount for the damage done to the Plaintiffs' credit due to MIP's breach, with reasonable attorney fees and costs associated with this action.

### (WSS/Tri Global)

761. Defendant WSS/Tri Global breached the implied covenant of good faith and fair dealing by making draws on the construction financing in excess of the amount of work actually completed on the project.

762. Defedat WSS/Tri Global also breached the implied covenant of good faith and fair dealing by refusing to make the payments on the loan obligations incurred by the Plaintiffs.

763. Defendant WSS/Tri Global's breach has resulted in a deprivation of the fruits of the contract by the Plaintiffs.

764. As a result of WSS/Tri Global's breach, the Plaintiffs have been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal investments, loan principal, missed payments, interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending Partners for late payments, the total amount due to

the Lending Partners to close out the financing, and a compensatory amount for the damage done to the Plaintiffs' credit due to WSS/Tri Global's breach, with reasonable attorney fees and costs associated with this action.

## COUNT V – FRAUDULENT INDUCEMENT

765. The Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this Complaint as though fully set forth herein.

766. Defendants WSS/Tri Global, North Shore, Clarkson, Drake, Snider, Shirato, the Shirato Indian Ridge Business Entities, the Lending Partners, Clark, Great Lakes, the Hurleys, as well as agents and other individuals associated with these entities, made fraudulent statements to the Plaintiffs to induce them into entering into the investment and loan contracts listed above.

767. The details and particulars of these misrepresentations are articulated in the above sections, which outline (1) each investors' interactions with the Defendants, (2) what representations were made, (3) when those representations were made, and (4) who made such representations.

768. These fraudulent statements consist of, but are not limited to, the timing of construction on the investment properties, the amount of actual construction completed on the project, that the investment was virtually riskless, the information which needed to be provided to the Lending Partners for the project, that no down payment was required at closing, that ample cash reserves backed the Plaintiffs' construction loans, and that all obligations in the form of payments to the Lending Partners were made and current.

769. These statements were made by Drake, Snider, McCleery, Clarkson, the Lending

Partners, Clark, Great Lakes, and the Hurleys in meetings held on the above listed dates and in multiple emails sent by these individuals as described in the general allegations section of this Complaint.

770. These statements were material as they directly related to whether or not the investment opportunity would provide the types of benefits sought after by potential investors.

771. Drake, Snider, McCleery, Clarkson, the Lending Partners, Clark, Great Lakes, and the Hurleys made these representations at a time when they knew these representations were false or, at a minimum, made these statements in a reckless and irresponsible manner.

772. These false statements were made knowingly, as individuals experienced in the construction and real estate industries knew, or should have known, that it was not feasible to complete this type of construction on such a large project within three to four months, or that such an investment was high risk, taking into account the volatility of the real estate market.

773. Drake, Snider, McCleery, Clarkson, the Lending Partners, Clark, Great Lakes, and the Hurleys all made these representations for the purpose of inducing the Plaintiffs to rely on said representations so that the Defendants could profit from the Plaintiffs' investments.

774. Furthermore, these representations were made by Drake, Snider, McCleery, Clarkson, the Lending Partners, Clark, Great Lakes, and the Hurleys on behalf of or with the apparent authority to be made for Shirato and the Shirato Indian Ridge Business Entities.

775. The Plaintiffs reasonably relied upon these representations in determining whether or not to enter into the contracts listed above as McCleery, Drake, and Snider all held themselves out as individuals experienced in the construction and real estate industries.

776. The Plaintiffs' reliance on these representations resulted in the Plaintiffs providing access to their credit to MIP, WSS/Tri Global, North Shore, and the Shirato Indian Ridge Business Entities, which resulted in monetary damage and damage to the Plaintiffs' credit ratings.

777. As a result of the Defendants' fraudulent inducement, the Plaintiffs have been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal investments, loan principal, missed payments, interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending Partners for late payments, the total amount due to the Lending Partners to close out the financing, and a compensatory amount for the damage done to the Plaintiffs' credit due to the Defendants' fraudulent inducement, with reasonable attorney fees and costs associated with this action.

## COUNT VI – FRAUDULENT MISREPRESENTATION

778. The Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this Complaint as though fully set forth herein.

779. In addition to those fraudulent or misleading statements identified herein, the Defendants made the following fraudulent statements which resulted in direct harm to the Plaintiffs:

    a.    MIP, McCleery, WSS/Tri Global, North Shore, Drake, and Snider made multiple representation to the Plaintiffs in the form of emails and newsletters on the dates listed in the general allegations section of this Complaint that led the Plaintiffs to believe that construction was progressing in accordance with the draws being made on the construction loans;

    b.    The Lending Partners made multiple representations to the Plaintiffs regarding the

progress of construction each time they permitted funds to be disbursed from the construction loans;

  c. MIP, McCleery, and Clarkson represented to the Plaintiffs that the Lending Partners were fully aware of the payment structure and the Lending Partners were in complete accord with those arrangements. These representations were made in emails on the dates listed in the general allegations section of this Complaint;

  d. MIP, McCleery, Clarkson, WSS/Tri Global, North Shore, Drake, Snider, the Lending Partners, Clark, Great Lakes, and the Hurleys represented to the Plaintiffs that no money would be required at closing. These representations were made in emails on the dates listed in the general allegations section of this Complaint and in the closing instruction provided to the title companies from the Lending Partners; and

  e. MIP, McCleery, Clarkson, WSS/Tri Global, North Shore, Drake, and Snider all made representations that all obligations on the loans had been paid in full pursuant to the agreements entered into between the Plaintiffs and the Defendants. These representations were made in emails on the dates listed in the general allegations section of this Complaint.

780. These statements were false, as later discovered by the Plaintiffs.

781. These representations were material as they directly related to the profitability and legitimacy of the Plaintiffs' investments.

782. McCleery, Clarkson, WSS/Tri Global, Drake, Snider, the Lending Partners, Clark, Great

Lakes, and the Hurleys all knew, or should have known, that the above listed representations were false as they were the individuals and entities in charge of supervising the construction and financing of the project.

783. The Defendants made these statements knowing the Plaintiffs would rely upon them and thereby induce the Plaintiffs to invest their money with the Defendants and continue to permit withdrawals to be made on the construction loans.

784. The Plaintiffs did in fact rely on the statements made by the Defendants in that they entered into the agreements and permitted the Defendants to make withdrawals on the construction financing to continue with the construction of the project.

785. The Plaintiffs' reliance was reasonable as the Defendants held themselves out as competent and experienced individuals in the construction, real estate, and banking fields.

786. As a result of the Defendants' fraudulent misrepresentations, the Plaintiffs have been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal investments, loan principal, missed payments, interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending Partners for late payments, the total amount due to the Lending Partners to close out the financing, and a compensatory amount for the damage done to the Plaintiffs' credit due to the Defendants' fraudulent misrepresentations, with reasonable attorney fees and costs associated with this action.

## COUNT VII – FRAUDULENT NON-DISCLOSURE

787. The Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this

Complaint as through fully set forth herein.

788. The Defendants failed to disclose the following material facts regarding the investment opportunity in the IRRC:

a. Defendants MIP, WSS/Tri Global, North Shore, the Shirato Indian Ridge Business Entities, the Lending Partners, Clark, Great Lakes, the Hurleys, and the individuals associated with these entities failed to disclose the full extent of the relationship between MIP, WSS/Tri Global and the Shirato Indian Ridge Business Entities;

b. Defendants MIP, WSS/Tri Global, North Shore, the Shirato Indian Ridge Business Entities, the Lending Partners, Clark, Great Lakes, the Hurleys, and the individuals associated with these entities failed to disclose the fact that WSS/Tri Global and North Shore were owned and managed by the same principals, which resulted in the purchase price on the property going to the same company which was to complete the construction on the property;

c. Defendants MIP, WSS/Tri Global, North Shore, the Shirato Indian Ridge Business Entities, the Lending Partners, Clark, Great Lakes, the Hurleys, and the individuals associated with these companies failed to disclose to the Plaintiffs that the loan disbursements constituting their investments were also used to make the interest payments on the construction loans;

d. Defendants MIP, WSS/Tri Global, North Shore, and the individuals associated with these companies failed to disclose to the Plaintiffs the amount of risk

involved in the project;

e.     Defendant MIP, WSS/Tri Global, North Shore, and the individuals associated with these companies failed to disclose that they did not have the cash to make the payments required pursuant to the credit partner agreements;

f.     Defendant MIP, WSS/Tri Global, North Shore, and the individuals associated with these companies failed to disclose that they would use draws from the Plaintiffs' loans to make the promised mortgage and interest payments during construction;

g.     Defendants MIP, WSS/Tri Global, North Shore, the Lending Partners, and the individuals associated with these companies failed to disclose to the Plaintiffs the true value of the undeveloped lots in the IRRC.

h.     Defendants MIP, WSS/Tri Global, North Shore, the Shirato Indian Ridge Business Entities, the Lending Partners, Clark, Great Lakes, the Hurleys, and the individuals associated with these entities failed to disclose to the Plaintiffs that the lots and infrastructure within the IRRC were not developed;

i.     Defendants MIP, WSS/Tri Global, North Shore, the Shirato Indian Ridge Business Entities, the Lending Partners, Clark, Great Lakes, the Hurleys, and the individuals associated with these entities failed to disclose to the Plaintiffs that no water, sewer, gas, or electric lines were run to the IRRC;

j.     Defendants MIP, WSS/Tri Global, North Shore, the Shirato Indian Ridge Business Entities, and the individuals associated with these entities failed to

disclose to the Plaintiffs that the broader IRRC and pockets of development did not have the capital necessary to finish the development and required investor participation for any chance of being completed; and

k.  Defendants MIP, WSS/Tri Global, North Shore, the Shirato Indian Ridge Business Entities, the Lending Partners, Clark, Great Lakes, the Hurleys, and the individuals associated with these entities failed to disclose to the Plaintiffs that, despite representations to the contrary, no "Full Service Resort Hotel," "High-tech Convention Center," "Third Largest Indoor Water Park in the United States," "Outdoor Water Park," "18-Hole Championship Golf Course," "Luxurious Golf Condominiums," "Deluxe Townhouse Condominiums," "Themed Retail Shopping Mall," "Casual and Fine Dining Restaurants," "Premier Day Spa," "Indian History Center," "Senior Gated Golf Community," "Private Resort Marina," or "Boating, Skiing, Fishing, Hiking, Biking, Shopping, Dining and much more!" existed within the IRRC.

789. The Defendants in this case had a legal duty to disclose this information to the Plaintiffs as the Defendants were holding themselves out as investment promoters or advisors.

790. All of the above-listed non-disclosures were material to the project as they directly related to the profitability and legitimacy of the IRRC.

791. All of the information listed above in the subsections of Paragraphs 780 of this Complaint was known by the Defendants prior to the Plaintiffs entering into the agreements with the Defendants.

792. All of the Defendants were aware, or should have been aware, that the information not disclosed was material to the investment and should have been disclosed.

793. The Defendants failed to disclose the above listed information for the specific purpose of increasing the likelihood that the Plaintiffs invest in the IRRC.

794. The Plaintiffs did in fact rely on the Defendants to fully disclose any information necessary to make the other representations made by the Defendants not misleading.

795. As a result of the Defendants' fraudulent non-disclosures, the Plaintiffs have been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal investments, loan principal, missed payments, interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending Partners for late payments, the total amount due to the Lending Partners to close out the financing, and a compensatory amount for the damage done to the Plaintiffs' credit due to the Defendants' fraudulent non-disclosure, with reasonable attorney fees and costs associated with this action.

## COUNT VIII – UNJUST ENRICHMENT

796. The Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

797. The Plaintiffs provided a significant amount of money to the Defendants in the form of draws taken on the construction loan put in place by the Plaintiffs for the IRRC.

798. The draws made by the Defendants created a serious detriment to the Plaintiffs.

799. To date, the Defendants have not provided services coinciding with the amounts drawn on the construction loans.

800. As a result, the Plaintiffs have been harmed in the amounts drawn on those accounts, as the amount of construction completed is drastically less than the amount drawn on the accounts.

801. Therefore, equity demands that Defendants be required to repay to the Plaintiffs the amount drawn on the construction accounts.

### (Unjust Enrichment Specifically Against Clarkson)

802. The Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

803. Defendant Clarkson received commissions from his work as a loan officer in processing the loans that constitute the basis of this action.

804. Defendant Clarkson should only have been entitled to receive these commissions if the loans were prepared and processed correctly.

805. Defendant Clarkson incorrectly prepared the loan documentations and, therefore, did not earn the commissions which he has taken.

806. As a result, Defendant Clarkson has been unjustly enriched at the detriment of the Plaintiffs.

807. Therefore, equity demands that Defendant Clarkson be required to repay to the Plaintiffs any and all amounts he received as commissions for his work as loan officer for the Plaintiffs.

### COUNT IX - CONVERSION

808. The Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

809. The Plaintiffs owned or possessed the right to the funds distributed from the construction

loans to the Defendants.

810. The Defendants intentionally interfered with the Plaintiffs' right to those funds, or the structures which were to be completed with those funds, by failing to perform or deliver services or goods as represented.

811. The Defendants' actions have deprived the Plaintiffs of possession or use of said property or services.

812. As a result of the Defendants' conversion, the Plaintiffs have been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal investments, loan principal, missed payments, interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending partners for late payments, the total amount due to the Lending Partners to close out the financing, and a compensatory amount for the damage done to the Plaintiffs' credit due to the Defendants' conversion, with reasonable attorney fees and costs associated with this action.

## COUNT X – RACKETEER INFLUENCED AND CORRUPT ORGANIZAIONS (RICO)

813. The Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

814. Relief should be granted under the Racketeering Influenced and Corrupt Organizations Act (RICO).

815. Under 18 U.S.C. § 1962(c), it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

816. Shirato, WSS/Tri Global, Drake, Snider, the Hurleys, MIP, Great Lakes, and the employees and/or agents of these entities, Clarkson, and Lawrence Bank came together for the purpose of constructing duplexes on Tract 34 of the IRRC. Each conducted, or participated in the conduct of, the affairs of this enterprise through a pattern of racketeering activity.

### Association-In-Fact Enterprise

817. Shirato and the Indian Ridge Entity Defendants; WSS/Tri Global, Drake, Snider, MIP, and the agents/employees of these entities; Clark and Lawrence Bank, Great Lakes and the Hurleys, and Clarkson formed an association-in-fact, wherein they associated together for the common purpose of profiting from the IRRC. Defendants engaged in a course of conduct to promote this common purpose, each undertaking roles vital to the success of the overall scheme.

818. While the goal of the enterprise—constructing a resort destination on a large parcel of land in Branson West, Missouri—was legitimate, each Defendant participated in furthering that goal through a series of misrepresentations, fraudulent omissions, and transfers of money known to be taken through these misrepresentations and omissions.

819. Moreover, as the construction in Tract 34 was just the first part of the first of three phases of the development of the IRRC, each Defendant saw involvement in the scheme as a lucrative, long-term endeavor that would yield significant profits.

820. Shirato owned the land on which the IRRC was to be developed, and the IRRC was his brainchild. He envisioned the IRRC as a premier resort destination of the upper Midwest. The

IRRC was to include a championship golf course, the second largest indoor water park in North America, as well as several other lavish amenities, making it a year-round attraction. Given the scope and expense of the undertaking, Shirato needed to find business partners to help finance and build the resort.

821. WSS/Tri Global, Drake, and Snider joined the enterprise, lured by the possibility of seemingly endless profits. They agreed to undertake construction as part of Phase 1 of the development, which construction was to take place on Tract 34.

822. As part of their agreement with Shirato, Drake and Snider were to recruit investors to fund construction. Shirato provided Drake and Snider with promotional material to help in recruiting investors. These promotional materials contained several misrepresentations regarding the improved status of the lots and the general condition of the overall IRRC, as detailed below.

823. Drake and Snider turned to MIP to recruit investors. Through MIP, Drake and Snider made several misrepresentations to Plaintiffs in recruiting them to invest in the IRRC, as detailed below. Enticed by promises of fast returns with minimal risk, Plaintiffs agreed to invest in the IRRC.

824. Drake and Snider continued to string Plaintiffs along by making several misrepresentations during the construction process, including, but not limited to, representations that construction was proceeding as planned.

825. These misrepresentations were necessary to ensure Plaintiffs would sign off on draw requests on their construction loans, so that Drake and Snider would be able to finance construction.

826. Recruiting investors was only part of the solution for the IRRC enterprise. The next step was to ensure that these willing investors would be able to secure construction loans through which construction on the IRRC could be financed.

827. Drake and Snider enlisted the services of Brent Clarkson at Top Flight Lending to assist in the loan approval process.

828. Clarkson falsified income and asset amounts on several of Plaintiffs' loan applications so that they would be approved for loans on more favorable terms, such as lower interest rates. By securing lower interest rates, WSS/Tri Global, which had agreed to make interest payments on behalf of Plaintiffs, was required to make a smaller financial outlay from the loan funds.

829. Clarkson was able to collect significant fees and commission for his role in getting Plaintiffs approved for their construction loans.

830. Drake and Snider, with help from Shirato, also enlisted the services of the several Lending Partners and other entities, such as Great Lakes, to provide construction loans to Plaintiffs, including Lawrence Bank.

831. As a Lending Partner, Lawrence Bank approved Plaintiffs' loan applications, despite Clarkson's falsifications and having in its possession Plaintiffs' financial information to verify Plaintiffs' income and asset information, and despite knowing that the lots had been substantially overvalued.

832. Moreover, Lawrence Bank exceeded its own policies and procedures in issuing Plaintiffs' construction loans. For instance, Lawrence Bank agreed to fund the IRRC construction loans without receiving any real down payment. Instead, Lawrence Bank agreed to accept letters from

WSS/Tri Global confirming that WSS/Tri Global had received down payment from the borrower. However, Lawrence Bank knew that no down payment had been received, as the initial disbursements it made to WSS/Tri Global at closing covered the entire costs of water/sewer/gas hookups, permits, clearing, and other expenses for which WSS/Tri Global was seeking reimbursement. Had a down payment been made, which, for each borrower, would have been at least $49,000.00, a disbursal fully covering these costs would have been unnecessary.

833. Lawrence Bank further violated its own protocols when it accepted a letter from WSS/Tri Global as proof of down payment on John Brent's loan, despite having initially required the down payment to be placed in escrow.

834. Furthermore, Lawrence Bank continued to approve draw requests and disburse loan funds despite knowing that construction was not proceeding according to plan, and knowing that Drake and Snider had made several material misrepresentations to Plaintiffs.

835. In addition to violating its own policies and procedures, Lawrence Bank violated applicable Kansas state laws and regulations. For instance, Lawrence Bank failed to utilize an independent appraiser, and failed to list the value of the property in its actual condition at the time of the appraisal, instead basing loan amounts on a hypothetical condition.

836. By participating in the IRRC, Lawrence Bank expected to receive profits in the form of loan fees collected up front and interest payments on the loans issued, and a quick payoff after a short construction period. At the closing of each loan, Lawrence Bank verified only that its fees were in the correct amount. Lawrence Bank expected to participate in this same manner in other phases of the development.

837. Each of the foregoing acts, described in greater detail below, allowed each Defendant to participate in the development of the IRRC through a pattern of racketeering activity.

**Predicate Acts – Shirato**
**(18 U.S.C. § 2314 – Causing Interstate Transportation)**

838. The Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

839. Shirato conducted, or participated in the conduct of, the enterprise's affairs by meeting with Drake and Snider, approving their plan for constructing duplexes on Tract 34, cosigning the municipal development bonds in early 2006, and providing Drake and Snider with promotional materials.

840. Drake and Snider used these marketing materials to persuade Plaintiffs to invest in Tract 34 of the IRRC and contained several fraudulent statements concerning the condition of the IRRC.

841. Needing to attract investors and other sources of financing to fund the IRRC, Shirato distributed materials representing that the lots were improved with water/sewer/gas, roads, and other such improvements, and that the amenities in the greater IRRC development were substantially completed even though he knew these representations were false.

842. These misrepresentations regarding the improved condition of Tract 34 and the substantial completion of the various amenities at the IRRC were used in a fraudulent scheme in which each Plaintiff was defrauded of tens of thousands of dollars. By making and distributing these false representations, Shirato caused Plaintiffs' loan funds to be transported in interstate

commerce through wire transfers to WSS/Tri Global, Drake, Snider, MIP, and their employees and/or agents.

**Predicate Acts – WSS/Tri Global, Drake, Snider, MIP**
**(18 U.S.C. § 1341 – Mail Fraud)**

843. The Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

844. As detailed above, WSS/Tri Global, Drake, Snider, MIP and its agents and/or employees concocted a scheme to defraud Plaintiffs of their construction loan proceeds. The scheme involved several fraudulent representations, detailed above, made both to induce Plaintiffs to invest in the IRRC, and to hide the scheme from Plaintiffs during its operation.

845. WSS/Tri Global, Drake, Snider, MIP and its agents and/or employees used the United States Mail and caused the mail to be used in furtherance of the scheme. WSS/Tri Global, Drake, Snider, MIP and its agents and/or employees had Plaintiffs mail payment coupons and other statements from Lending Partners to WSS/Tri Global so that WSS/Tri Global could make interest payments on the loans. WSS/Tri Global further used the mails by mailing to Lawrence Bank and other Lending Partners interest payments on Plaintiffs' loans. This was essential to carrying out the scheme, as it allowed Lawrence Bank to keep the loan accounts out of default while WSS/Tri Global siphoned funds out of Plaintiffs' loan accounts.

846. As a result of this scheme, Plaintiffs were defrauded of hundreds of thousands of dollars.

**(18 U.S.C. § 1343 – Wire Fraud)**

847. The Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint

as though fully set forth herein.

848. As detailed above, WSS/Tri Global, Drake, Snider, MIP and its agents and/or employees concocted a scheme to defraud Plaintiffs of their construction loan proceeds. The scheme involved several fraudulent representations, detailed above, made both to induce Plaintiffs to invest in the IRRC, and to hide the scheme from Plaintiffs during its operation.

849. WSS/Tri Global, Drake, Snider, MIP and its agents and/or employees used wires in furtherance of the scheme. WSS/Tri Global, Drake, Snider, MIP and its agents and/or employees made several misrepresentations to Plaintiffs regarding the IRRC in emails and newsletters sent via email. These newsletters misled Plaintiffs into believing that construction was progressing when, in fact, little progress had been made.

850. Employees and/or agents for WSS/Tri Global and MIP similarly made several misrepresentations to Plaintiffs via telephone.

851. Furthermore, WSS/Tri Global received Plaintiffs' funds from Lending Partners through wire transfers.

852. WSS/Tri Global, by use of the wires, defrauded Plaintiffs out of hundreds of thousands of dollars.

### (18 U.S.C. § 2314 – Causing Interstate Transportation)

853. The Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

854. WSS/Tri Global conducted, or participated in the conduct of, the enterprise's affairs, both directly and through its agent MIP and McCleery, and Clarkson, by recruiting investors to help

finance construction on Tract 34. In doing so, WSS/Tri Global, directly and through its agents, made several fraudulent statements to each Plaintiff to persuade them to invest in the IRRC. These fraudulent statements consist of, but are not limited to, the timing of construction on the investment properties, the method by which the duplexes would be constructed, the improved status of the lots, the amount of actual construction completed on the project, that the investment was virtually riskless, the information which needed to be provided to the Lending Partners for the project, that no down payment was required at closing, that ample cash reserves backed the Plaintiffs' construction loans, and that all obligations in the form of payments to the Lending Partners were made and current.

855. These fraudulent statements were made in several regular emails and other communications from WSS/Tri Global, Drake, Snider, MIP and their employees and/or agents to Plaintiffs over the course of the project—a span covering nearly three years between 2006 and 2009.

856. These several fraudulent statements induced Plaintiffs to approve several draw requests, each in excess of $5,000, and caused these loan funds to be transmitted in interstate commerce to WSS/Tri Global, Drake, Snider, and MIP and its agents and/or employees, from Lawrence Bank, located in Kansas, and other Lending Partners, to a bank account owned by WSS at Wells Fargo in Littleton, Colorado (account # 9245060828), and through Bankers Bank of the West in Denver, Colorado to a bank account owned by Tri Global (account # 1200397) via wire transfers.

857. These wire transfers included the following:

a.   A transfer on or about November 20, 2007, from Tim Brent's loan in the amount of $94,630.00;

b.   Two transfers from John Brent's loan, the first on or about January 10, 2008 in the amount of $94,630.00, and the second on or about August 25, 2008 in the amount of $60,077.00;

c.   A transfer on or about December 4, 2007, from the Hadlock's loan in the amount of $94,630.00; and

d.   Three transfers from the Preszler's loan, the first on or about December 4, 2007, for $94,630.00, the second on or about July 17, 2008, for $53,174.00, and the third on or about August 28, 2008, for $49,369.00.

858. Defendants caused the construction loan funds to be transmitted in interstate commerce knowing that they were taken by fraud.

### Predicate Acts – Brent Clarkson
### (18 .S.C. § 2314 – Transportation of Money Taken by Fraud)

859. The Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

860. Brent Clarkson participated in the scheme concocted by WSS/Tri Global, Drake, Snider, MIP and its agents and/or employees, detailed above, to defraud Plaintiffs of their construction loan proceeds.

861. In email exchanges with representatives from Lawrence Bank, Clarkson expressed his willingness to do whatever was necessary to get Plaintiffs approved for the constructions loans.

862. Clarkson participated in the scheme by doctoring loan applications from Plaintiffs to Lending Partners. Clarkson submitted a loan application from each Plaintiff, which stated each applicant's assets and liabilities, to each Lending Partner, including Lawrence Bank. On numerous applications, Clarkson changed the numbers on the loan applications based on the Lending Partners' requests and with their knowledge.

863. Each Plaintiff provided personal financial statements and current tax returns. On information and belief, Clarkson or agents of the Lending Partner did not alter the information on these forms. In many circumstances, these documents revealed that the Plaintiffs lacked the requisite income and net worth otherwise necessary to qualify for the amount loaned and borrowed. The Lending Partners knew or had reason to know that the Plaintiffs' loan-to-value ratios were grossly overstated.

864. These documents further revealed each investor's inability to make the monthly interest payments; however, none of the Lending Partners were concerned with the Plaintiffs' inability to make the interest payments as they had been assured that Drake and Snider would make all interest payments through one of their many companies.

865. Each Lending Partner either knew of or willfully disregarded the discrepancies between the income documents the Plaintiffs provided and the loan applications submitted by Clarkson, Drake, Snider, McCleery, Shirato, North Shore, MIP, and WSS/Tri Global.

866. Clarkson used wires in furtherance of the scheme.

867. Employees and/or agents for WSS/Tri Global and MIP similarly made several misrepresentations to Plaintiffs via telephone.

868. Furthermore, WSS/Tri Global received Plaintiffs' funds from Lending Partners through wire transfers.

869. WSS/Tri Global, by use of the wires, defrauded Plaintiffs out of hundreds of thousands of dollars.

870. Defendants caused the construction loan funds to be transmitted in interstate commerce knowing that they were taken by fraud.

### Predicate Acts – Lawrence Bank, David Clark, Great Lakes, Kip Hurley, Mary Hurley (18 U.S.C. § 2314 – Transportation of Money Taken by Fraud)

871. Lawrence Bank participated in the enterprise by disbursing a large portion of the construction loan funds to WSS/Tri Global, North Shore, Drake, Snider, and Clarkson at closing of each loan and to WSS/Tri Global upon draw requests submitted by WSS/Tri Global. Lawrence Bank distributed the loan funds despite knowing that the lots were unimproved, and having inspection reports issued monthly during 2007 and 2008 indicating that construction was not proceeding as WSS/Tri Global had represented to Plaintiffs.

872. David Clark is individually responsible for each act committed by Lawrence Bank. He personally inspected Tract 34 before Lawrence Bank became involved in the IRRC. He personally agreed to the scheme as presented by Shirato, Drake, Snider, and their entities, including the down payment arrangement discussed above. He was the loan officer over each of the loans Lawrence Bank issued to Plaintiffs. He approved the HUD statements showing a down payment to be paid by or in behalf of Plaintiffs, knowing full well none was to be made. He personally approved the construction draw requests despite inspection reports showing minimal

progress. In short, Lawrence Bank's involvement in the IRRC ran through David Clark.

873. Lawrence Bank was fully aware of the scheme and participated with the intent to defraud Plaintiffs of their loan funds. This is evidenced by several meetings and other communications between agents or employees of Lawrence Bank and WSS/Tri Global.

874. These include a meeting between Les Dreiling and David Clark of Lawrence Bank, representatives of Wells Fargo, and Shirato to discuss funding of the construction loans in or about October 2007, during which Clark and Dreiling inspected Tract 34 and saw no evidence of any improvements, such as utilities and roads, to Tract 34, other than some clearing.

875. That the lots were unimproved was further confirmed by appraisal reports sent to Lawrence Bank for each lot on which it approved a loan. Each of these reports made clear that the lots were unimproved and that the appraised value was based on hypothetical conditions.

876. Despite knowing that the lots were unimproved, employees at Lawrence Bank, under the direction of David Clark, prepared loan documents containing misrepresentations regarding the improved status of the lots and failing to disclose the actual value of the lots in their as-appraised condition. The loan documents were drafted so that each Plaintiff was representing and warranting that utilities were available at the boundaries of the land. However, Lawrence Bank and its agents, including Great Lakes and the Hurleys, knew that the lots were unimproved, that the Plaintiffs were not able to make a physical inspection on their own due to the fact that they each resided out of state, and that Plaintiffs were relying on Lawrence Bank's inspection and appraisal in executing the loan agreements as well as Great Lakes position overlooking Tract 34.

877. Lawrence Bank's awareness of and intentional participation in the scheme is also

evidenced by its agreement to fund the IRRC construction loans without receiving any real down payment, as discussed above. Instead, Lawrence Bank agreed to accept letters from WSS/Tri Global confirming that WSS/Tri Global had received down payment from the borrower.

878. However, Lawrence Bank knew that no down payment had been received, as the initial disbursements it made to WSS/Tri Global at closing covered the entire costs of water/sewer/gas hookups, permits, clearing, and other expenses for which WSS/Tri Global was seeking reimbursement. Had a down payment been made, which, for each borrower, would have been at least $49,000.00, a disbursal fully covering these costs would have been unnecessary.

879. Lawrence Bank's awareness of and intentional participation in the scheme is further evidenced by emails and phone calls from David Clark or other Bank employees to Clarkson and McCleery at MIP, demanding interest payments once WSS/Tri Global ceased making the interest payments on time.

880. Furthermore, Lawrence Bank was fully aware that WSS/Tri Global was representing to Plaintiffs that construction was progressing, despite inspection reports indicating otherwise. Lawrence Bank received several newsletters from WSS/Tri Global to Plaintiffs making these misrepresentations.

881. At the closing of each loan, WSS/Tri Global and North Shore received the following disbursements from Lawrence Bank, through Great Lakes, to WSS/Tri Global:

    a.    A transfer on or about November 20, 2007, from Tim Brent's loan (loan # 12326200) in the amount of $225,293.10. Of this amount $94,630.00 was to be used for water/sewer/gas hookups, surveys, construction and other permits,

excavation and for 20 percent of the modular unit that would be used to construct the duplex. The remaining $130,663.10 was for the purchase of the raw, unimproved land on which the duplex was to be constructed. The disbursed amounts covered the full expense of each improvement, yet the amount was not reduced for the down payment allegedly made to WSS/Tri Global.

b.    A transfer on or about December 4, 2007, from the Hadlock's loan (loan # 12338200) in the amount of $227,078.30. Of this amount $94,630.00 was to be used for water/sewer/gas hookups, surveys, construction and other permits, excavation and for 20 percent of the modular unit that would be used to construct the duplex. The remaining $132,448.30 was for the purchase of the raw, unimproved land on which the duplex was to be constructed. The disbursed amounts covered the full expense of each improvement, yet the amount was not reduced for the down payment allegedly made to WSS/Tri Global.

c.    A transfer on or about December 4, 2007, from the Preszler's loan (loan # 12358200) in the amount of $228,955.30. Of this amount $94,630.00 was to be used for water/sewer/gas hookups, surveys, construction and other permits, excavation and for 20 percent of the modular unit that would be used to construct the duplex. The remaining $134,325.30 was for the purchase of the raw, unimproved land on which the duplex was to be constructed. The disbursed amounts covered the full expense of each improvement, yet the amount was not reduced for the down payment allegedly made to WSS/Tri Global. Lawrence

Bank transferred these funds before any appraisal had been performed on the land. Indeed, the appraisal did not actually occur until December 18, 2007 and was not accepted by Lawrence Bank until January 3, 2008.

d.   A transfer on or about January 10, 2008, from John Brent's loan (loan # 12363200) in the amount of $226,211.65. Of this amount $94,630.00 was to be used for water/sewer/gas hookups, surveys, construction and other permits, excavation and for 20 percent of the modular unit that would be used to construct the duplex. The remaining $131,581.65 was for the purchase of the raw, unimproved land on which the duplex was to be constructed. The disbursed amounts covered the full expense of each improvement, yet the amount was not reduced for the down payment allegedly made to WSS/Tri Global.

882. Each of the disbursals made at closing were wired to a bank account belonging to Great Lakes at Metropolitan National Bank in Branson West, Missouri.

883. As detailed *supra*, Kip and Mary Hurley were the owners and sole officers of Great Lakes as it existed in Missouri.

884. Lawrence Bank disbursed loan funds to cover the cost of the raw, unimproved land despite knowing that the actual value of the raw, unimproved land was several thousands of dollars less than the price actually paid.

885. Furthermore, Lawrence Bank approved Plaintiffs for construction loan amounts not in compliance with the Bank's loan policies in effect at the time Plaintiffs' loans were approved. In addition to approving loans without taking a down payment, Lawrence Bank issued the loans

outside its lending area, and relied on appraisals from an appraiser not on its approved list.

886. After transferring these initial draw requests to WSS/Tri Global and North Shore, Lawrence Bank received several construction progress inspection reports showing little to no progress being made on construction. These reports showed the following:

    a.    On Tim Brent's lot, the only progress made was 75 percent completion of grading and rough clearing. No other progress was noted from April 2008 until September 2008, the last month the lot was inspected.

    b.    On the Hadlock's lot, the only progress made was 75 percent completion of grading and rough clearing. No other progress was noted from March 2008 until September 2008, the last month the lot was inspected.

    c.    On John Brent's lot, the only progress made by August 2008 was the completion of grading and clearing, and foundation. By September 2008, the last month the lost was inspected, only minimal additional progress was noted, specifically the beginning stages of the framing process.

    d.    On the Preszler's lot, the only progress made by August 2008 was the completion of grading and clearing, foundation, and footings. By September 2008, the last month the lot was inspected, only minimal additional progress was noted, specifically the completion of framing and the beginning stages of roof finishing.

887. However, WSS/Tri Global submitted additional draw requests on the construction loans for materials such as stone, lumber, and concrete slab. Lawrence Bank disbursed funds in accordance with these draw requests despite having in its possession inspection reports showing

work for which WSS/Tri Global had previously submitted draw requests not having been completed.

888. Such disbursals include, but are not limited to, a wire transfer for $60,077.00 for concrete slab, foundation, waterproofing, and lumber for the unit funded by Plaintiff John Brent on or about August 25, 2008, to Tri Global Development's account at Bankers Bank of the West, in Denver Colorado.

889. Lawrence Bank similarly made two disbursals totaling $102,543.00 for framing, labor, lumber (twice), waterproofing and foundation from the unit funded by the Preszlers. These two disbursals were made on or about July 18, 2008, in the amount of $53,174.00, to WSS's account at Wells Fargo in Littleton, Colorado, and August 28, 2008, in the amount of $49,369.00, to Tri Global Development's account at Bankers Bank of the West, in Denver Colorado.

890. In total, Lawrence Bank disbursed over $289,000.00 from John Brent's loan. This amount equals approximately 63 percent of the entire loan even though the inspection reports sent to the Bank show only 20 percent of the construction completed.

891. In total, Lawrence Bank has disbursed over $330,000.00 from the Preszlers' loan. This amount equals approximately 85 percent of the entire loan even though the inspection reports sent to the Bank show only 27.25 percent of the construction completed.

892. In total, Lawrence Bank has disbursed over $230,000.00 from the Hadlocks' loan. This amount equals approximately 59 percent of the entire loan even though inspection reports sent to the Bank show only 1.5 percent of the construction completed.

893. In total Lawrence Bank has disbursed over $227,000.00 from Tim and Marianne Brent's

loan. This amount equals approximately 50 percent of the entire loan even though inspection reports sent to the Bank show only 1.5 percent of the construction completed.

894. Lawrence Bank disbursed the loan proceeds to WSS/Tri Global, Drake, and Snider in interstate commerce from its headquarters in Lawrence, Kansas, via wire transfers, sometimes through its agent Great Lakes, to various bank accounts, including a bank account belonging to WSS at Wells Fargo in Littleton, Colorado, and a bank account belonging to Tri Global through Bankers' Bank of the West in Denver, Colorado.

895. At the time of each transfer of loan funds, Lawrence Bank knew of the misstatements WSS/Tri Global, Drake, and Snider made to Plaintiffs, yet caused the loan funds to be transferred in interstate commerce. Indeed, Lawrence Bank refused Plaintiffs' requests to freeze construction loans.

896. Moreover, Lawrence Bank disbursed Plaintiffs' construction loan funds despite its contractual obligation not to disburse loan funds until construction for which previous draw requests were authorized had been completed.

897. Lawrence Bank knew prior to each transfer that the funds would be transported across state lines, to banks outside of Kansas.

898. Lawrence Bank transferred funds, sometimes through its agent Great Lakes, across state lines with knowledge that the transactions defrauded Plaintiffs of their money.

### (18 U.S.C. § 1341 – Mail Fraud)

899. The Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

900. As detailed above, Lawrence Bank, its employees, and agents including Great Lakes and the Hurleys, participated in a scheme to defraud Plaintiffs of their construction loan proceeds. Lawrence Bank participated in the scheme by misrepresenting the improved status of the land in the loan documents, including the loan agreement and promissory note, sent to Plaintiffs, and by failing to disclose the actual value of the land in its as-appraised condition.

901. As out-of-state borrowers, Plaintiffs relied on Lawrence Bank's representations regarding the condition and value of the land in executing the loan documents and authorizing disbursements of loan funds, a portion of which went to Lawrence Bank at the closing of each loan.

902. Lawrence Bank and its employees and agents, including Great Lakes and the Hurleys, used the United States Mail and caused the mail to be used in furtherance of the scheme. Lawrence Bank or its agents, Great Lakes and the Hurleys, mailed the loan documents to Plaintiffs to be executed and returned to the Bank.

903. As a result of Lawrence Bank's participation in the scheme, Plaintiffs were defrauded of several thousands of dollars.

904. Lawrence Bank's acts occurred regularly over a period of more than three years and involved each Plaintiff, as well as other victims who are not part of this lawsuit. Lawrence Bank's involvement in the scheme is currently ongoing, as Lawrence Bank currently is attempting to collect on each loan, knowing that the loan funds were taken and disbursed fraudulently. Lawrence Bank has in the past attempted, and currently is attempting to collect from several borrowers who became involved in the IRRC just as Plaintiffs, but who are not

parties to this lawsuit.

905. As a direct and proximate result of the enterprise's conduct, each Plaintiff has been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiffs' principal investments, loan principal, missed payments, interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending partners for late payments, the total amount due to the Lending Partners to close out the financing, and a compensatory amount for the damage done to the Plaintiffs' credit due to the Defendants' actions, with reasonable attorney fees and costs associated with this action.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment as to the causes of action set forth above and against the Defendants as follows:

1.    For the Plaintiffs' principal investment(s) in the IRRC;

2.    For an amount equivalent to the total loans incurred by the Plaintiffs relating to their investment(s) in the IRRC;

3.    For repayment of all funds drawn from the Plaintiffs construction loans representing their investment(s) in the IRRC;

4.    For repayment of all loan payments made by the Plaintiffs in an attempt to protect their credit;

5.    For repayment of all property taxes paid by the Plaintiffs;

6.    For all damages resulting from the Defendants' unlawful conduct and violations associated with civil conspiracy, joint venture, fraud, negligence, breach of fiduciary duty,

breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment,

conversion, and Federal RICO, in an amount to be proven at trial, but that amount in no way will

be less than an amount that includes the principal investment, loan balance, missed payments,

interest payments and property taxes paid by the Plaintiffs, penalties assessed by the Lending

Partners for late payments, and the total amount due to the Lending Partners to close out the

financing, a compensatory amount for the damage done to the Plaintiffs' credit, and treble

damages of that amount pursuant to 18 U.S.C. § 1964(c);

      7.    For attorneys' fees and costs associated with bringing this action pursuant to 18

U.S.C. § 1964(c) and other relevant provisions;

      8.    For punitive damages pursuant to Utah Code Annotated § 78B-8-201(1)(a) and

other relevant provisions in an amount deemed appropriate by the Court; and

      9.    For such other relief as the Court deems just and appropriate.

      10.    Plaintiffs' damages, although not specified, qualify for Tier 3 discovery under

Rule 26(c) of the Utah Rules of Civil Procedure.

      DATED AND SIGNED this __10th__ day of July, 2012.

                        ASCIONE & ASSOCIATES, LLC

                        PATRICK J. ASCIONE
                        Attorney for Plaintiffs